David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Monsi Morales (State Bar No. 235520)
*mmorales@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Counsel to the Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>HOME ORGANIZERS, INC., a Delaware corporation, HOME CLOSETS, INC., a California corporation, CBD FRANCHISING, INC., a California corporation, CLOSETS BY DESIGN, INC., a California corporation, CLOSET WORLD, INC., a Delaware corporation, CLOSET DIMENSIONS, INC., a California corporation, CBD LAS VEGAS LLC, a Nevada limited liability company, and CLOSET WORLD ARIZONA, LLC, a Nevada limited liability company,<br><br>Debtors. | Case No.: 2:10-bk-19762-RN<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos.: 2:10-19972-RN, 2:10-19973-RN, 2:10-19974-RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-19977-RN and 2:10-19978-RN)<br><br>**EMERGENCY MOTION OF DEBTORS FOR ORDER AUTHORIZING AND APPROVING USE OF CASH COLLATERAL ON AN INTERIM BASIS AND GRANTING REPLACEMENT LIENS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF FRANK MELKONIAN IN SUPPORT** |
| **Check One or More as Appropriate:**<br><br>Affects All Debtors:                                       ☒<br>Affects Home Organizers Inc. only:            ☐<br>Affects Home Closets, Inc. only:                 ☐<br>Affects CBD Franchising, Inc. only:             ☐<br>Affects Closets By Design, Inc. only:           ☐<br>Affects Closet World, Inc. only:                   ☐<br>Affects Closet Dimensions, Inc. only:          ☐<br>Affects CBD Las Vegas LLC only:                ☐<br>Affects Closet World Arizona LLC only:     ☐ | Hearing:<br><br>Date:  TBD<br>Time:  TBD<br>Place:  Courtroom 1668<br>           255 E. Temple Street<br>           Los Angeles, CA 90012 |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; THE DEBTORS' ALLEGEDLY SECURED LENDER; THE DEBTORS' 20 LARGEST UNSECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

1  **PLEASE TAKE NOTICE** that pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1(a), the debtors in these jointly-administered chapter 11 cases: Home Organizers Inc. ("Home Organizers"), Closet World, Inc., CBD Franchising, Inc., Closets By Design, Inc., Closet Dimensions, Inc., Home Closets Inc., CBD Las Vegas LLC, and Closet World Arizona, LLC (the "Subsidiary Debtors" and, together with Home Organizers collectively, the "Debtors"), hereby move on an emergency basis for an Order authorizing the Debtors to use cash collateral pursuant to section 363(c)(2)(B) of the Bankruptcy Code and, to the extent necessary, to grant a replacement lien and other relief as adequate protection to the creditors that assert security interests in the Debtors' cash collateral (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the hearing on the Motion shall take place on March ___, 2010, at _____ .m., or as soon thereafter as the matter can be heard, before the Honorable Barry Russell, United States Bankruptcy Judge, in Courtroom 1668, located at 255 E. Temple Street, Los Angeles, CA .

## EMERGENCY RELIEF IS REQUIRED

The Debtors run a successful franchise and contracting business that specializes in the custom design, manufacture and installation of closets, garages and other home storage spaces and solutions. Because certain of the Debtors' assets are encumbered by alleged security interests asserted by Madison Capital Funding, LLC (the "Secured Lender"), the Debtors will not be able to operate in chapter 11 unless they are authorized to use cash collateral. Among other immediate expenses, the Debtors' payroll checks were distributed on March 12, 2010 and the next payroll comes due on March 26, 2010. The Debtors do not believe that all of the March 12 paychecks have been cashed and believe that certain payroll checks will not be honored until the Debtors have use of cash collateral. The Debtors are concerned that, among other things, unless they can pay employees, the employees will not come to work and the business will have to shut down. In addition, the Debtors have daily needs for materials to complete construction projects and if the Debtors cannot pay essential expenses, they will be required to cease operations, which will result in immediate and irreparable harm to the Debtors' estates (the "Estates") and their creditors.

These cases were filed after the Secured Lender purported to exercise control over all of the Subsidiary Debtors by allegedly removing the Board of Directors and appointing Tony Natale as an independent director seizing control over all of the Debtors' cash and accounts, including trust funds that the Debtors hold as customer deposits on future work and franchisee deposits to be used for advertising. The Debtors' attempts to negotiate a standstill and consensual return of cash and accounts were unsuccessful and it was necessary to seek protection to allow the Debtors to continue to operate. Because of the facts and circumstances surrounding the filing of the Debtors' cases, the Debtors were unable to negotiate a consensual cash collateral agreement with the Secured Lender. Accordingly, the Debtors require an order from this Court authorizing the use of cash collateral on an interim basis pending a final hearing so that the Debtors can pay immediate critical expenses pending the final hearing.

Dated: March 19, 2010                        PEITZMAN, WEG & KEMPINSKY LLP


                                             /s/ Scott F. Gautier
                                             Scott F. Gautier
                                             Proposed counsel to Debtors and Debtors in Possession

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## JURISDICTION AND VENUE

The Debtors commenced the above-captioned cases (the "Cases") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Central District of California, Los Angeles Division, on March 16 and 18, 2010 (collectively, the "Petition Date"). In accordance with sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are now operating their businesses and managing their financial affairs as debtors and debtors in possession.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtors' bankruptcy Estates and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O). Venue of the Cases is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## II.

## STATEMENT OF FACTS

**A.    General Background**

The Debtors are organized as a consolidated corporate group under Home Organizers which acts as a holding company for the Subsidiary Debtors (collectively, the "Company" or the "Debtors"). The Company is one of the largest custom closet and other home organization system companies in the United States, with several name brands, a nationwide franchise network, and over 500 employees in California.

From its founding through about 2005, the Company was able reach extraordinary levels of growth and profitability, based, in part, on its unique proprietary technical model, the acquisition of two name brands, six branches, and a nationwide franchise network. In fact, for the fiscal year 2005, the Company was able to realize approximately $114 million in yearly revenue.

In or around 2006, the Company's revenues began to decline due to the approaching economic recession. Despite budget cuts (which have saved the Company from suffering

debilitating losses), the severe economic recession still posed a grave threat to the Company. Nevertheless, the Company: (a) has produced and continues to produce a profit year over year, (b) currently anticipates annual revenues in excess of $48 million, (c) employs over 500 California residents, (d) pays its vendors and employees on time, and (e) continues to provide exceptional customer service.

**B.    Cash Management And Key Employees**

Pre-petition, cash and compensation received in the ordinary course of each affiliate's business was deposited into an account for each affiliate, but swept into a concentration account in the name of Closet World, Inc. with California Bank & Trust (the "Concentration Account") at the close of business each day. As expenses for each affiliate were paid, an automatic transfer from the Concentration Account was made to the affiliate's separate account to cover the draft on such account. The Debtors maintained inter-company accounting records of all such transactions and to allocate general administrative costs between the various subsidiary Debtors.

The Debtors have over 500 employees that design, manufacture and install the Debtors' products. Most of the employees are resident in California with a few in Nevada. The Company is also a franchisor and its franchises employ thousands of people across the country.

**C.    Expected Cash Flow**

A projection of the Debtors' expected consolidated cash flows for the next 15 weeks is attached to the Declaration of Frank Melkonian (the "Melkonian Declaration") as Exhibit A.

**D.    Secured Lender Claims**

On or about June 30, 2004, the Company entered into a loan transaction with the Secured Lender, in which the Secured Lender, as Lender and Agent, provided the Company with a Revolving Loan facility up to the maximum principal amount of $8,000,000, plus term loans in the principal amount of $13,500,000 (the "Loan Transaction"). The Debtors also entered into a guarantee and collateral agreement (the "Security Agreement") and a collateral agreement (the "Collateral Agreement") with the Secured Lender, pursuant to which the Debtors purportedly (i) granted a security interest to the Secured Lender in certain collateral, including all of the Debtors' personal

1  property, and (ii) appointed the Secured Lender as their attorney in fact upon the occurrence of certain
2  events of default.
3    The Collateral Agreement purportedly granted the Secured Lender a security interest in
4  substantially all of the Debtors' assets and their respective shares and membership interests.
5    In a Forbearance Agreement dated July 29, 2009 ("Forbearance Agreement"), Home
6  Organizers acknowledged and agreed that Events of Default had occurred and were continuing, and
7  that additional Events of Default were anticipated to occur.  In this Agreement, the Secured Lender
8  agreed to forbear from exercising its rights and remedies under the loan documents until September
9  30, 2009.
10    On March 9, 2010, pursuant to its rights under the Collateral Agreement, the Secured Lender
11 sent a Notice of Exercise of Voting Rights ("Notice"), to each of the Debtors and their counsel.  In
12 accord with the Notice, the Secured Lender notified the Debtors that, due to the occurrence and
13 continuation of the Events of Default, it was exercising its voting rights pursuant to Section 6.3(b) of
14 the Collateral Agreement.  The Notice contained written consents in lieu of meeting of the sole
15 stockholder ("Written Consents") for each subsidiary organized as a corporation – signed in each
16 instance by the Secured Lender pursuant to the exercise of its rights to vote all shares thereof.  Each
17 Written Consent provided for the removal of all existing directors of each such subsidiary, and for
18 the election of Tony Natale to serve as sole director of each subsidiary corporation.
19    The Secured Lender has provided notice to Frank Melkonian, the CEO of the Debtors, of its
20 intent to exercise its voting rights in the pledged stock of Home Organizers, pursuant to a Pledge
21 Agreement.  To date, the stock of Home Organizers owned by Melkonian has not been subject to any
22 action by the Secured Lender.  However, the Secured Lender has made it clear that it intends to
23 exercise its rights against the pledged shares and take control of Home Organizers.
24    Following receipt of the Notice, the Debtors worked in good-faith with the Secured Lender in
25 an attempt to resolve the issues and provide a plan to repay or restructure its obligations to the
26 Secured Lender.  However, on March 12, 2010, the Secured Lender seized control of the Debtors'
27 accounts and took approximately $1.5 million, which subsequently caused the Debtors' accounts to be
28

overdrawn by almost $100,000 pre-petition. Again, on March 15, 2010, the Secured Lender withdrew over $120,000 from the Debtors' accounts.

The Debtors have explained to the Secured Lender, through counsel, that the funds seized by the Secured Lender constituted cash to cover checks that had already been issued by the Debtors, including payroll checks. As well, a large portion of the cash constituted client deposits that are held in trust for the benefit of its clients and advertising funds that are held in trust for its franchisees to cover the cost of joint advertising pursuant to a National Promotion and Protection Fund.

Currently, approximately $7.5 million[1] is outstanding pursuant to the Credit Agreement

The Debtors attempted to reach a resolution and accommodation with the Secured Lender, but no reasonable accommodation could be reached.

**E.    The Debtors' Assets**

As set forth in the Melkonian Declaration, the Debtors' business is valued in excess of $10 million, well in excess of the expected claims against their Estates. As of the Petition Date, the Debtors hold approximately $525,000 in cash assets (most of these funds are checks and credit card receipts that had not "cleared" as of the Petition Date). True and correct copies of the Debtors' current financial statements are attached to the Melkonian Declaration as Exhibit B.

**F.    The Debtors' Need To Use Cash Collateral**

The Debtors operate a business with over 500 employees that design, manufacture and install the Debtors' products. These employees include custom closet and other home organization system designers and installers, who interface with the Company's customers on a daily basis, manufacturing employees, who fabricate the custom organization systems, and administrative, financial and management personnel.

To preserve the Company's going concern value, the Debtors must continue to operate. Attached to the Melkonian Declaration as Exhibit A is a cash budget prepared by the Debtors (the "Budget"). The Budget sets forth the Debtors' anticipated cash needs through June 25, 2010.

As set forth in the Budget, the Debtors require cash primarily for three purposes: (1) payroll, (2) materials and supplies and (3) general administrative and office expenses. As reflected in the

---

[1] This includes approximately $1.6 million that the Secured Lender took from the Debtors' accounts over the past 7 days pursuant to its exercise of control over the Debtors' accounts.

Budget, it is projected that the Debtors' cash balance will increase from approximately $525,000 to approximately $2.4 million by June 25, 2010.

Because projections are forward-looking, they can never be entirely accurate. Thus, in order to protect the Debtors from fluctuations in expenses and costs, the Debtors request that they be permitted to have the flexibility to increase expenditures by up to 20% for any particular line item in the Budget, and 15% in the aggregate. Under this structure, the Debtors will have the flexibility to operate their business without disruption.

The Budget only covers the period through June 25, 2010, and is only intended to cover the period until a final hearing on the Motion can be held. The Debtors will attempt, prior to a final hearing date on the Motion, to negotiate a consensual cash collateral or debtor in possession financing agreement with the Secured Lender. If and when a consensual agreement is reached, the Debtors will file a supplement to the Motion describing the terms of the consensual agreement and requesting that the Court approve the consensual agreement at the final hearing. If for any reason a consensual agreement is not reached before final hearing, the Debtors will file a revised cash collateral Budget that covers the period of cash collateral use, and request that the Court approve the revised Budget at the final hearing.

### III.

### APPLICABLE LEGAL STANDARD

**A.    The Secured Lender is Adequately Protected**

Section 363(c)(2) of the Bankruptcy Code provides that a Debtor may not use cash collateral without either the consent of the secured party or an order of the court. Section 363(e) provides that a court may condition the Debtors' use of cash collateral on the Debtors providing "adequate protection" of the secured party's interest in the collateral being used. The type of adequate protection that is appropriate in a particular case will depend on the nature of the case. Indeed, "[a]dequate protection [is] a concept which is to be decided flexibly on the proverbial case-by-case basis." *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987). It is black-letter law that a Secured Lender is adequately protected if there is no projected diminution in the collateral and the Debtors are projected to operate profitably. *See, e.g., In re Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del.

-8-

1996); *see also, In re Constable Plaza Associates, L.P.*, 125 B.R. 98 (Bankr. S.D.N.Y. 1991) (Secured Lender adequately protected where cash collateral used to preserve value of assets). In these cases, the Debtors do not project that there will be any diminution in the value of their assets and, accordingly, the Secured Lender is adequately protected.

Moreover, it is well established that the existence of an equity cushion alone can constitute adequate protection to secured creditor when a debtor seeks to use cash collateral. *In re Mellor*, 734 F.2d 1396 (9th Cir. 1984). In *Mellor*, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a matter of law. *Id.* at 1404. The Ninth Circuit indicated that a cushion of less than 20% could also constitute adequate protection and cited with approval decisions holding that equity cushions of between 10% to 20% constituted adequate protection. *Id.*, citing *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (equity cushion of approximately 15% to 20% was adequate protection notwithstanding that the debtors had no equity in the property). *See also*, *In re Boulders on the River, Inc.*, 164 B.R. 99 (9th Cir. BAP 1994) (creditor was adequately protected with an equity cushion of 11.45%); *In re Hawaiian Pacific Industries*, 17 B.R. 670, 673 (Bankr. D. Hawaii 1982) (15% cushion constituted adequate protection).

Here, for the Debtors to continue their business operations, they will need to use the Cash Collateral. The Debtors commenced these Cases with an aggregate of approximately $525,000 of cash in their possession and project that, through June 25, 2010, they will have increased their cash to approximately $2.4 million. Accordingly, there will be no diminution of cash collateral over the proposed period during which the Debtors will use cash collateral. Even if there were some diminution, however, the Secured Lenders' alleged claims total approximately $7.5 million, without regard to any lender liability claims that the Debtors may assert. As such, although the Debtors may dispute the Secured Lender's claims, even if these claims were accepted at face value, as set forth in the Melkonian Declaration, the value of the Debtors' assets far exceeds these claims by more than $2.5 million, or greater than 33%. Hence, the Secured Lender is more than adequately protected by a significant equity cushion. The Debtors will also grant the Secured Lender a replacement lien, to the

extent of any diminution in the value of the Secured Lender's interests, on all postpetition property of the same type and character as the property to which the Secured Lender's prepetition liens extended.

Therefore, in consideration for the use of the Cash Collateral, the Debtors request that the Court enter an order providing the Secured Lender with a replacement lien, to the extent of any diminution in value of the Secured Lender's interests in the Debtors' assets, on all postpetition property of the same type and character as the property to which the Secured Lender's prepetition lien extended. The equity cushion and the grant of a replacement lien more than adequately protects the Secured Lender's security interests, if any, in the Debtors' assets.

**B.    The Court Should Authorize The Interim Use Of Cash Collateral Pending A Final Hearing**

Pursuant to FRBP 4001(b)(2), the Court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion, and may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. *See generally, In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (discussion of importance of emergency relief granting use of cash collateral at the commencement of a case).

As set forth above, it is critical that the Debtors be authorized to pay their critical expenses as set forth in the Budget. Most significantly, the Debtors have rent due on or about March 30, payroll that was distributed on March 12 and which is due again on March 26. If the Debtors are not permitted to pay their employees and their other critical expenses, the Debtors will be required to cease operations, which will be extremely damaging to the Debtors and their creditors, including, potentially, the Secured Lender. Therefore, the Debtors' use of Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors and their bankruptcy Estates.

Under the circumstances, the Debtors request that the Court set a final hearing as soon as the Court's calendar permits on a date no later than April 30, 2010, and authorize the Debtors to use Cash Collateral in accordance with the Budget on an interim basis pending the final hearing.

**WHEREFORE**, the Debtors request that the Bankruptcy Court enter an Order, substantially in the form attached to the Melkonian Declaration as Exhibit D:

A. Approving the use of Cash Collateral on an interim basis;

B. Granting the Secured Lender, to the extent necessary, a replacement lien as adequate protection for the use of Cash Collateral;

C. Setting a final hearing to consider approval of Cash Collateral on a final basis; and

D. Granting such other and further relief as may be appropriate under the circumstances.

Dated: March 19, 2010                     PEITZMAN, WEG & KEMPINSKY LLP


By: /s/ Scott F. Gautier
     Scott F. Gautier
Proposed Bankruptcy Counsel for the Debtor

**DECLARATION OF FRANK MELKONIAN**

I, Frank Melkonian, hereby declare:

1. I am over 18 years of age and am the Chief Executive Officer and a member of the Board of Directors of Home Organizers, Inc., a Delaware corporation ("Home Organizers"). Each of the facts contained in this declaration is based upon my personal knowledge and, if called as a witness to do so, I could competently testify thereto.

2. On March 16, 2010 (the "Petition Date") Home Organizers commenced this bankruptcy case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On March 18, 2010, its subsidiaries: CBD Franchising, Inc.; Home Closets, Inc.; Closets By Design, Inc.; Closet World, Inc.; Closet Dimensions, Inc.; CBD Las Vegas LLC; Closet World Arizona, LLC (the "Subsidiary Debtors" and collectively with Home Organizers, the "Debtors") filed separate bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code and have requested, *ex parte*, that these various cases be jointly administered.

**GENERAL BACKGROUND**

3. The Debtors are organized as a consolidated corporate group under Home Organizers, which acts as a holding company for the Subsidiary Debtors (together, Home Organizers and the Subsidiary Debtors are hereinafter referred to as the "Company"). The Company is one of the largest custom closet and other home organization system companies in the United States, with several name brands, a nationwide franchise network, and over 500 employees in California.

4. From its founding through about 2005, the Company was able reach extraordinary levels of growth and profitability, based, in part, on its unique proprietary technical model, the acquisition of two name brands, six branches, and a nationwide franchise network. In fact, for the fiscal year 2005, the Company was able to realize approximately $114 million in yearly revenue.

5. In or around 2006, the Company's revenues began to decline due to the approaching economic recession. Despite budget cuts (which have saved the Company from suffering debilitating losses), the severe economic recession still posed a grave threat to the Company. Nevertheless, the Company: (a) has produced and continues to produce a profit year over year, (b) currently anticipates

annual revenues in excess of $48 million, (c) employs over 500 California residents, (d) pays its vendors and employees on time, and (e) continues to provide exceptional customer service.

**Cash Management And Key Employees**

6. Pre-petition, cash and compensation received in the ordinary course of each affiliate's business was deposited into an account for each affiliate, but swept into a concentration account in the name of Closet World, Inc. with California Bank & Trust (the "Concentration Account") at the close of business each day. As expenses for each affiliate were paid, an automatic transfer from the Concentration Account was made to the affiliate's separate account to cover the draft on such account. The Debtors maintained inter-company accounting records of all such transactions and to allocate general administrative costs between the various Subsidiary Debtors.

7. The Debtors have over 500 employees that design, manufacture and sell the Debtors' products. These employees include custom closet and other home organization system designers and installers, who interface with the Company's customers of a daily basis, manufacturing employees, who fabricate the custom organization systems, and administrative, financial and management personnel. Most of the employees are resident in California with a few in Nevada.

**Expected Cash Flow**

8. A projection of the Debtors' expected consolidated cash flows for the next 15 weeks is attached hereto as Exhibit A.

**Secured Lender Claims**

9. On or about June 30, 2004, the Company entered into a loan transaction with Madison Capital Funding, LLC ("Madison"), in which Madison, as Lender and Agent, provided the Company with a Revolving Loan facility up to the maximum principal amount of $8,000,000, plus term loans in the principal amount of $13,500,000 (the "Loan Transaction").

10. Also on June 30, 2004, the Debtor entered into a guarantee and collateral agreement (the "Security Agreement") with Madison, pursuant to which the Debtor purportedly (i) granted a security interest to Madison in certain collateral, including all of the Debtor's personal property, and (ii) appointed Madison as its attorney in fact upon the occurrence of certain events of default.

11. Pursuant to the Collateral Agreement dated June 30, 2004, entered into by and between Madison and the subsidiaries of Home Organizers, the subsidiaries granted Madison a security interest in substantially all of their assets and their respective shares and membership interests. The Collateral Agreement also grants Madison the power to exercise the voting rights of the shares.

12. On March 9, 2010, pursuant to its rights under the Collateral Agreement, Madison sent a Notice of Exercise of Voting Rights ("Notice"), to each of the subsidiaries, Home Organizers and their counsel. In accord with the Notice, Madison notified Home Organizers and its subsidiaries that due to the occurrence and continuation of the Events of Default, it was exercising its voting rights pursuant to Section 6.3(b) of the Collateral Agreement.

13. The Notice contained written consents in lieu of meeting of the sole stockholder ("Written Consents") for each subsidiary organized as a corporation – signed in each instance by Madison pursuant to the exercise of its rights to vote all shares thereof. Each Written Consent provided for the removal of all existing directors of each such subsidiary, and for the election of Tony Natale to serve as sole director of each subsidiary corporation. For each subsidiary that is organized as a limited liability company, the Notice contained Written Consents of the sole member in lieu of meeting, which provided for the termination of any existing operating agreement of the subsidiaries, and the adoption of a new operating agreement that made the direct parent company of that entity (in each instance, one of the other subsidiaries) sole member with rights to manage that entity.

15. Madison has provided me with notice of its intent to exercise its voting rights in the pledged stock of Home Organizers, pursuant to the Pledge Agreement. To date, my stock in Home Organizers has not been subject to any action by Madison. However, Madison has made it clear that it intends to exercise its rights against the pledged shares and take control of Home Organizers.

14. Following receipt of the Notice, the Debtors worked in good-faith with Madison in an attempt to resolve the issues and provide a plan to repay or restructure its obligations to Madison. However, on March 12, 2010, Madison seized control of the Debtors' accounts and took approximately $1.5 million, which has subsequently caused the Debtors' accounts to be overdrawn by almost $100,000 pre-petition. Again, on March 15, 2010, Madison withdrew over $120,000 from the Debtors' accounts.

15. The Debtors have explained to Madison, through counsel, that the funds seized by Madison constituted cash to cover checks that had already been issued by the Debtors, including payroll checks. As well, a large portion of the cash constituted client deposits that are held in trust for the benefit of its clients and advertising funds that are held in trust for its franchisees to cover the cost of joint advertising pursuant to a National Promotion and Protection Fund.

16. Currently, approximately $7.5 million[2] is outstanding pursuant to the Credit Agreement, without taking into consideration any of the Company's possible offsetting claims against Madison.

17. The Debtors attempted to reach a resolution and accommodation with Madison, but no reasonable accommodation could be reached.

**The Debtors' Assets**

18. As the Debtors' CEO, I am responsible for the assets under my direction and control and I am qualified to testify regarding the value of such assets.

19. Although a going-concern valuation can be based on many factors, my opinion is that the Debtors' business is worth in excess of $10 million today. My valuation of this asset is based, among other things, on my review of (a) projections of future cash flows and earnings ("EBITDA") that I have prepared for the business together with the Debtors' CFO, as well as (b) financial models and valuations prepared by BBK, an independent financial firm that was retained by the Debtors, at Madison's request, during the month of August 2009. True and correct copies of these records that I have reviewed in coming to my conclusions about the value of the Debtors' business are attached hereto as Exhibit C.

20. As of the Petition Date, the Debtors hold approximately $525,000 in cash assets. True and copies of the Debtors' current financial statements are attached hereto as Exhibit B.

**The Debtors' Need To Use Cash Collateral**

21. The Debtors operate a business with over 500 employees that design, manufacture and install the Debtors' products.

---

[2] This includes approximately $1.6 million that Madison took from the Debtors' accounts over the past 7 days pursuant to its exercise of control over the Debtors' accounts.

22. In order to preserve this going concern value, the Debtors must continue to operate. Attached hereto as Exhibit A is a cash budget prepared by the Debtors (the "Budget"). The Budget sets forth the Debtors' anticipated cash needs through June 25, 2010.

23. As set forth in the Budget, the Debtors require cash primarily for three purposes: (1) payroll, (2) materials and supplies and (3) general administrative and office expenses. As reflected in the Budget, I project that the Debtors' cash balance will increase from approximately $525,000 to approximately $2.4 million by June 25, 2010.

24. I will attempt, prior to a final hearing date on the Motion, to negotiate a consensual cash collateral or debtor in possession financing agreement with Madison.

25. Attached hereto as Exhibit D is a proposed order granting the Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information and belief.

Executed this 19th day of March, 2010, at Whittier, CA.

_____
Frank Melkonian