David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Monsi Morales (State Bar No. 235520)
*mmorales@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA  90067
Telephone:  (310) 552-3100
Facsimile:  (310) 552-3101

Counsel for the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>HOME ORGANIZERS, INC., a Delaware corporation, HOME CLOSETS, INC., a California corporation, CBD FRANCHISING, INC., a California corporation, CLOSETS BY DESIGN, INC., a California corporation, CLOSET WORLD, INC., a Delaware corporation, CLOSET DIMENSIONS, INC., a California corporation, CBD LAS VEGAS LLC, a Nevada limited liability company, and CLOSET WORLD ARIZONA, LLC, a Nevada limited liability company,<br><br>           Debtors. | Case No.: 2:10-bk-19762-RN<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos.: 2:10-19972-RN, 2:10-19973-RN, 2:10-19974-RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-19977-RN and 2:10-19978-RN)<br><br>**NOTICE OF MOTION AND MOTION FOR DISMISSAL OF CHAPTER 11 CASES; MEMORANDUM OF POINTS AND AUTHORIES; DECLARATIONS OF GERARD A. THOMPSON AND ALEXANDER STEVENSON** |
| **Check One or More as Appropriate:**<br><br>Affects All Debtors:<br>Affects Home Organizers Inc. only:<br>Affects Home Closets, Inc. only:<br>Affects CBD Franchising, Inc. only:<br>Affects Closets By Design, Inc. only:<br>Affects Closet World, Inc. only:<br>Affects Closet Dimensions, Inc. only:<br>Affects CBD Las Vegas LLC only:<br>Affects Closet World Arizona LLC only: | Hearing:<br>Date:  July 22, 2010<br>Time:  2:00 p.m.<br>Place:  Courtroom 1645<br>    255 East Temple Street<br>    Los Angeles, CA 90012 |

**TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY JUDGE,**

**THE OFFICE OF THE UNITED STATES TRUSTEE, THE OFFICIAL COMMITTEE OF**

**UNSECURED CREDITORS, AND OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that, on July 22, 2010 at 2:00 p.m., or as soon thereafter as the matter may be heard (the "Hearing"), before the Honorable Richard M. Neiter, United States Bankruptcy Judge, in Courtroom 1645, located at 255 E. Temple Street, Los Angeles, CA, the Bankruptcy Court will consider and act upon the motion of the above-captioned debtors (the "Debtors") for an order dismissing the Debtors' chapter 11 cases (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice and Motion, the attached Memorandum of Points and Authorities and Declarations of Gerard A. Thompson and Alexander Stevenson filed in support of the Motion, the records and files in the above-captioned chapter 11 cases, and such additional evidence and argument as may be presented at or before the Hearing.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), any party wishing to respond to the Motion must file with the Bankruptcy Court and serve on the counsel for the Debtors and the United States Trustee a written response not later than fourteen (14) days before the Hearing.  Pursuant to Local Bankruptcy Rule 9013-1(h), failure to file and serve timely a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be consent to the granting of the relief requested in the Motion.

Dated:  July 1, 2010                    PEITZMAN, WEG & KEMPINSKY LLP


                                        By:___/s/ David B. Shemano_____
                                               David B. Shemano
                                        Counsel for the Debtors and Debtors in Possession

1

2

# TABLE OF CONTENTS

3

*Page No.*

4    I. RELIEF REQUESTED ............................................................................................3

5    II. JURISDICTION AND VENUE............................................................................4

6    III. BACKGROUND ...................................................................................................4

7      A.  Madison Exercises Rights And Remedies. ..........................................4

8      B.  The Debtors File For Chapter 11 Protection..........................................5

9      C.  Madison Seeks Dismissal Of The Cases And Relief From The Stay. ....................6

10      D.  The Settlement Between The Debtors And Madison. ..............................6

11      E.  The Debtors Comply With The Sale Milestones And Receive Sale Offers. ...........7

12    IV. EF ACQUIRES MADISON'S CLAIMS AND THE PARTIES NEGOTIATE A

13      FORBEARANCE AGREEMENT........................................................................8

14      A.  The Board Determines To Halt The Sale Process And Negotiate With EF ...........9

15      B.  The Executed Forbearance Agreement.................................................9

16    V. THE DEBTORS DO NOT REQUIRE ANY FURTHER RESTRUCTUING OF DEBT TO

17      OPERATE PROFITABLY ...................................................................................10

18    VI. DISMISSAL OF THE CASES IS IN THE BEST INTERESTS OF THE DEBTORS

19      AND THEIR CREDITORS..................................................................................12

20      A.  Dismissal Is Appropriate Pursuant To Section 305(a)(1) Of The

21      Bankruptcy Code ...............................................................................................12

22      B.  Dismissal Is Appropriate Pursuant To Section 1112(b) Of The

23      Bankruptcy Code ...............................................................................................13

24    VII. CONCLUSION .................................................................................................14

25    DECLARATION OF GERARD A. THOMPSON....................................................15

26    DECLARATION OF ALEXANDER STEVENSON................................................21

27

28

1
2
3

## TABLE OF AUTHORITIES

4

*Page No.*

5

**Cases**

6    *In re Capistrano Associat*es, 66 B.R. 421 (Bankr. S.D. Fla. 1986)………………………………...12

7    *In re Colonial Ford, Inc.,* 24 B.R. 1014 (Bankr. D. Utah 1982)………………………………... 12

8    *In re Hickman*, 384 B.R. 832, 840 (Bankr. 9th Cir. 2008)…………………………………… 13

9    *In re Melp, Ltd.*, 143 B.R. 890 (Bankr. E.D. Mo. 1992)…………………………………….. 14

10   *In re OptInRealBig.com, LLC*, 345 B.R. 277, 282-83 (Bankr. D. Colo. 2006)……………………13

11   *In re Walter*, 108 B.R. 244, 251 (Bankr. C.D. Cal. 1989)…………………………………….13

12   **Other Authorities**

13   H.R. Rep. No. 95-595 95th Cong., 1st Sees. 325, U.S. Code Cong. & Admin News, p. 6281…….12

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### RELIEF REQUESTED

As set forth below, these chapter 11 cases were commenced on an emergency basis in March 2010 as a result of precipitous action taken by the Debtors' secured lender at the time, Madison Capital Funding, LLC ("Madison"), in the midst of what the Debtors believed to be good faith negotiations concerning the restructuring of approximately $9 million in outstanding indebtedness. Specifically, Madison, with little or no notice, (1) attempted to replace the Debtors' board of directors pursuant to its purported rights under stock pledge agreements, (2) swept approximately $1.6 million in cash from the Debtors' bank accounts, and (3) obtained a state court injunction in Illinois that purported to enjoin bankruptcy filings.

In April 2010, the Debtors and Madison reached agreement on a settlement of the disputes between the parties. In summary, Madison acknowledged the validity of the chapter 11 filings and continuing role of the Debtors' existing board and management. In exchange, the Debtors agreed to payoff the indebtedness owed to Madison by July 30, 2010. To effectuate the payoff, the Debtors agreed to embark on a sale process that included the employment of a chief restructuring officer, engagement of an investment banker, and the satisfaction of several sale milestones between April and July 2010.

Concurrently with the sale process, Frank Melkonian ("Melkonian"), the Debtors' CEO, Chairman of the Board, and controlling common stockholder, endeavored to locate a new lender willing to assume Madison's position as secured lender and permit the Debtors to exit chapter 11 without the necessity of a sale of the Debtors' assets to a third party. Melkonian's efforts were successful and on or about June 10, 2010, Exclusive Funding LLC ("EF") acquired all of Madison's claims against the Debtors and became the Debtors' secured lender.

After EF's acquisition of Madison's claims, the Debtors and EF negotiated a forbearance agreement that permits the Debtors to exit chapter 11 without any need to (1) sell assets, (2) restructure the Debtors' unsecured debt pursuant to a reorganization plan, or (3) impair existing equity holders. As a result of the projected repayment of unsecured claims, the Official Committee of Unsecured Creditors (the "Committee") has represented to the Debtors that the Committee supports a

dismissal of these cases.  Consequently, the Debtors believe that the existing chapter 11 cases have served their purpose and it is in the best interests of all interested parties that the cases be dismissed as soon as possible.  Therefore, pursuant to this Motion, the Debtors request that the Bankruptcy Court dismiss these cases pursuant to sections 305(a) and 1112(b) of the Bankruptcy Code.

## II.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtors' chapter 11 estates (the "Estates") and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 305(a) and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code").

## III.

## BACKGROUND

The Debtors are organized as a corporate group (the "Company") under Home Organizers, Inc. ("HOI"), which is the parent company of its subsidiary entities, Closet World, Inc., CBD Franchising, Inc., Closets By Design, Inc., Closet Dimensions, Inc., Home Closets, Inc., CBD Las Vegas, LLC, and Closet World Arizona, LLC (collectively, the "Subsidiary Debtors").  The Company is one of the largest custom closet and other home organization system companies in the United States with several name brands, a nationwide franchise network, over 500 employees in California, and over $46 million in revenues last year.

A.    Madison Exercises Rights And Remedies.

The Debtors and Madison entered into a financing arrangement pursuant to a Credit Agreement dated as of June 30, 2004 (including all amendments, the "Credit Agreement"), in which Madison, as Lender and Agent, provided the Debtors with a revolving loan facility up to the maximum principal amount of $8,000,000, plus term loans in the principal amount of $13,500,000.  As of March 18, 2010, the Debtors were indebted to Madison under the Credit Agreement in the amount of $8,163,422.98 plus certain fees and costs (the "Indebtedness").  To secure advances under the Credit Agreement, the

4

Debtors granted Madison a lien on substantially all of their assets, including a lien on HOI's equity interests in the Subsidiary Debtors.  In addition, Melkonian executed a non-recourse pledge granting Madison a lien on his equity interest in HOI to secure the Indebtedness.

Certain events of default under the Credit Agreement occurred in 2009, including the expiration of the term of the Credit Agreement without the repayment of all amounts outstanding.  The Debtors worked in good faith with Madison to address the events of default and effectuate a restructuring of the Credit Agreement.  However, on March 9, 2010, Madison gave notice (the "Notice") that it was exercising its purported rights under stock pledge agreements to prohibit HOI from exercising any voting rights with respect to the equity interests in the Subsidiary Debtors until the Company cured all defaults, and that, instead, Madison would exercise the voting rights.  Pursuant to the Notice, Madison purported to exercise the voting rights to replace the existing directors of the Subsidiary Debtors with a new director chosen by Madison, Tony Natale ("Natale").  Additionally, on March 9, 2010, Madison sent a notice to Melkonian, HOI's controlling shareholder, informing Melkonian that, effective March 23, 2010, Madison intended to exercise its voting rights under his pledge agreement to remove all existing directors of HOI and elect a single new director selected by Madison.

While the Company disputed that Madison properly exercised its rights and remedies with respect to the equity interests and disputed that Natale was properly appointed, the Debtors continued to work in good faith with Madison to reach a consensual resolution.  However, on or about March 12, 2010, Madison swept the Company's bank accounts of approximately $1.6 million in cash.  Then, on March 16, 2010, without any notice to the Company, Madison obtained a temporary restraining order from a State Court in Cook County, Illinois, that purported to enjoin, among other entities, HOI from exercising any rights or taking any actions inconsistent with (i) the Notice, and (ii) the rights and obligations of Natale, including wrongfully filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code on behalf of the Subsidiary Debtors without the consent of Natale.

B.    The Debtors File For Chapter 11 Protection.

While the Company believed that Madison's exercise of purported rights and remedies was improper and that the temporary restraining order issued in Illinois was invalid and of no effect, the Company concluded that bankruptcy protection was required in order to protect the Company's assets

5

and the interests of creditors other than Madison.  Therefore, on March 16, 2010, HOI commenced its

chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  HOI

then issued shareholder resolutions removing Natale as director of the Subsidiary Debtors (to the

extent he was ever actually appropriately appointed) and reinstating the prior directors.  The reinstated

directors then authorized the chapter 11 filings for the Subsidiary Debtors.  On March 18, 2010, each

of the Subsidiary Debtors commenced a chapter 11 case by filing a voluntary petition for relief under

chapter 11 of the Bankruptcy Code.

Further, to ensure Madison could not replace the board of HOI, on March 19, 2010, HOI filed a

complaint for declaratory and injunctive relief to enjoin Madison from exercising purported voting

rights to replace Melkonian as the director of HOI, thereby commencing an adversary proceeding

before this Court (Adv. Case No. 2:10-01504-RN) (the "Adversary Action").

C.     Madison Seeks Dismissal Of The Cases And Relief From The Stay.

On March 19, 2010, in response to the commencement of the bankruptcy cases, Madison filed

a motion for relief from stay in the HOI chapter 11 case (the "Stay Relief Motion") and a motion to

dismiss with respect to each chapter 11 case commenced by the Subsidiary Debtors (the "Dismissal

Motion").  The primary allegation of the Stay Relief and Dismissal Motions was that the Subsidiary

Debtor cases were filed without proper authorization and Madison should be permitted to exercise its

rights and remedies under the Credit Agreement and related stock pledge agreements.  The Debtors

filed oppositions to the Stay Relief and Dismissal Motions and asserted that the bankruptcy cases were

properly commenced.

D.     The Settlement Between The Debtors And Madison.

On or about April 6, 2010, the Debtors and Madison reached agreement on a stipulated

settlement order resolving all issues raised by the Adversary Action, Stay Relief Motion and Dismissal

Motion (the "Settlement Order").  The Bankruptcy Court initially entered the Settlement Order on

April 27, 2010.  Pursuant to a motion for clarification filed by Tony Natale, the Bankruptcy Court

entered a revised Settlement Order on May 26, 2010.

Pursuant to the Settlement Order, among other things, the Debtors agreed to a timetable by

which they were required to undertake and accomplish certain actions toward the ultimate

consummation of a sale of their businesses and payoff of Madison's claims no later than July 30, 2010

(the "Sale Milestones") in the event no other consensual resolution with Madison was reached.  In the event that the Debtors failed to satisfy the Sale Milestones or the occurrence of another "Board Replacement Event," as described in the Settlement Order, the Debtors and Melkonian agreed that (a) the directors then serving on the boards of directors of the Debtors organized as a corporation shall be deemed removed and replaced with Natale as the sole director, and (b) the limited liability company agreements of the Debtors organized as limited liability companies shall be replaced with limited liability company agreements approved by Natale.

On May 26, 2010, the Bankruptcy Court entered a stipulated cash collateral order authorizing the Debtors to use Madison's cash collateral (the "Cash Collateral Order").  The Cash Collateral Order provides, among other adequate protection granted to Madison, that the failure of the Debtors to satisfy a Sale Milestone or the occurrence of another Board Replacement Event is an event of default entitling Madison to exercise its rights and remedies as set forth in the Cash Collateral Order.

E.    The Debtors Comply With The Sale Milestones And Receive Sale Offers.

The Debtors diligently complied with all Sale Milestones and avoided all Board Replacement Events set forth in the Settlement and Cash Collateral Orders.  Pertinently:

- On or before April 10, 2010, the Debtors retained Tony Natale as their Chief Restructuring Officer to supervise the Debtors' use of cash and the sale process.

- On or before April 12, 2010, the Debtors retained FocalPoint Securities, LLC ("FocalPoint"), as their investment banker to solicit bids for the Debtors' assets.

- On or before April 30, 2010, the Debtors provided all reasonable assistance to FocalPoint to permit FocalPoint to prepare and distribute an offering memorandum to third parties.

- On or before May 28, 2010, FocalPoint received several letters of intent for the purchase of the Debtors' businesses.

After receiving the letters of intent in late May, FocalPoint solicited more detailed asset purchase agreements from the bidders that submitted letters of intent in order to satisfy the next Sale Milestone of June 25, 2010, by which date the Debtors were required to have entered into an asset purchase agreement and file a sale motion.  In early June, FocalPoint received three proposed asset purchase agreements, including one bid submitted by Melkonian.  While the bids differed in format,

details, contingencies and risks, the bids had the following proposed terms in common: (1) satisfaction of Madison's secured claims, (2) satisfaction of administrative expenses, and (3) no value or payment to equity holders.  With respect to general unsecured claims, each of the bids provided for the assumption of unsecured claims and satisfaction over several months, but differed in the scope of claims assumed and the timing of the satisfaction.

To consider the bids, the Debtors scheduled a meeting of the Board of Directors for June 11, 2010.

## IV.

### EF ACQUIRES MADISON'S CLAIMS AND THE PARTIES NEGOTIATE A FORBEARANCE AGREEMENT

Concurrently with the sale process demanded by Madison, Melkonian endeavored to locate a new lender willing to assume Madison's position as secured lender and permit the Debtors to exit chapter 11 without the necessity of a sale of the Debtors' assets to a third party.  Melkonian's efforts were successful and, on or about June 10, 2010, EF acquired all of Madison's claims against the Debtors.[1]  While Melkonian, Gerry Thompson (the Debtors' CFO), and other insiders are minority members of EF (either individually or through limited liability companies), the managing member and majority of the members are not insiders or affiliates of the Debtors and EF is represented by independent counsel.

Promptly after the acquisition, the Debtors and EF had discussions concerning the status of the chapter 11 cases and how to proceed.  It was immediately apparent that EF had acquired Madison's claims with the intent to work with the Debtors to facilitate an exit from chapter 11 and that EF had no desire to require a sale of assets and payoff of the indebtedness by July 30, 2010.  EF promptly extended all Sale Milestones for 60 days to permit the Debtors adequate time to consider all strategic options.[2]

---

[1] In addition to purchasing Madison's claims for principal at par, EF also paid approximately $1,000,000 to acquire Madison's claims for interest, attorneys' fees, and other costs.

[2] Subsequently, the Debtors and EF entered into a written stipulation providing for a modification of the Settlement Order and Cash Collateral Order that included a 60-day extension of all Sale Milestones. On June 24, 2010, the Debtors filed a motion to approve the stipulation.

A.    The Board Determines To Halt The Sale Process And Negotiate With EF

On June 11, 2010, the Debtors' Board held a meeting, which was attended by, among others, all current Board members (Frank Melkonian, Gerry Thompson, Jerry Egner, and Alex Jivalagian),[3] the Debtors' bankruptcy counsel (Peitzman Weg & Kempinsky LLP), corporate counsel (Reeder Lu LLP), Chief Restructuring Officer (Tony Natale), and investment bankers (FocalPoint).  At the meeting, among other items of discussions, FocalPoint presented to the Board a detailed summary and analysis of the sale offers received, and the Debtors' counsel informed the Board of the details concerning EF's (a) acquisition of Madison's secured claims, (b) immediate 60-day extension of the Sale Milestones, and (c) expressed intention to negotiate a forbearance agreement that would permit the Debtors to exit chapter 11 quickly, satisfy the claims of unsecured creditors, and leave equity holders unimpaired.

After extended discussion, the Board voted to not to pursue any of the pending sale offers and instead concluded that it was in the best interests of the Company, its creditors and shareholders to immediately commence forbearance discussions with EF and execute a forbearance agreement as soon as possible that would comfortably allow the Debtors to exit chapter 11 as soon as possible.

B.    The Executed Forbearance Agreement.

In the weeks after the Board meeting, the Debtors and EF negotiated in good faith and at arms'-length a forbearance agreement, which was finalized and executed on July 1, 2010 (the "Forbearance Agreement").[4]  A true and correct copy of the Forbearance Agreement is attached as Exhibit A to the Declaration of Gerard A. Thompson (the "Thompson Declaration").  By its terms, the Forbearance Agreement will become effective upon dismissal of the Debtors' cases.  In summary:

- The Company shall not be required to make any principal payments until 18 months after the dismissal of the bankruptcy cases.

- Interest on outstanding obligations shall accrue at the rate of fourteen and one-quarter percent (14.25%) and be paid monthly.

---

[3] While Melkonian and Thompson attended the meeting, Melkonian was excluded from certain discussions and did not vote because of potential conflicts arising from his submission of a sale offer and minority interest in EF, and Thompson did not vote on certain matters because of potential conflicts arising from his minority interest in EF.

[4] Because Melkonian and Thompson are members of EF, Mary Reiman, the Company's Executive Vice President, was the Company officer responsible for the negotiations.

9

- The Company shall pay monthly (a) a management and maintenance fee equal to 1.0% per annum of the aggregate "Commitments" (approximately $12.85 million), and (b) a forbearance fee equal to 1.0% per annum of the then outstanding "Obligations" (currently approximately $8.8 million).

- The Company will be required to satisfy certain projected EBITDA requirements as a condition to the continuation of the forbearance.

- EF will open the revolving credit facility under the Credit Agreement, in an amount not to exceed the Borrowing Availability, if the Company requires such funds provided that the Company meets certain EBITDA projections, there are no new Events of Default and none shall occur as a result of such extension, and the Fixed Charge Coverage Ratio shall equal or exceed 1.0:1.0.

## V.

### THE DEBTORS DO NOT REQUIRE ANY FURTHER RESTRUCTUING OF DEBT TO OPERATE PROFITABLY

Pursuant to the Forbearance Agreement, the Debtors will not be required to make any principal payments on their secured debt until January 2012 at the earliest.  Consequently, the Debtors will have sufficient cash flow in the coming months to both timely satisfy administrative expense and prepetition claims, and remain current with their vendors and other creditors.  The Debtors have worked with FocalPoint to prepare a cash flow projection that demonstrates their capability to operate outside of the protection of chapter 11.  A copy of the cash flow projection is attached as Exhibit B to the Thompson Declaration and Declaration of Alexander Stevenson.

As set forth in the projection, the Debtors anticipate repaying prepetition general unsecured claims in full, estimated to be approximately $2.7 million, as follows:[5]

---

[5] To avoid any ambiguity, the described repayment plan is not intended as a condition to dismissal or intended to have any binding effect on any interested party.  Upon dismissal, all parties will retain all of their rights and remedies and, to the extent an individual creditor is not satisfied by the repayment plan, such creditor will have the ability to exercise any right or remedy available under applicable law. The Debtors are optimistic that they will be able to repay claims even more expeditiously than contemplated in the projection.  The Debtors believe the projections reflect relatively conservative assumptions and, therefore, to the extent that the Debtors' actual performance in the coming months is better than projected, the Debtors will be able to expedite payments.

| Amount of Claim | Estimated Number of Creditors | Estimated Aggregate Amount of Claims | Treatment |
|---|---|---|---|
| $1-$10,000 | 189 | $223,000 | Paid within 30 days of dismissal |
| $10,001-$20,000 | 12 | $168,000 | One-half paid within 30 days of dismissal and one-half paid within 60 days of dismissal |
| $20,001-$40,000 | 9 | $236,000 | One-half paid within 60 days of dismissal and one-half paid within 90 days of dismissal |
| $40,001-$100,000 | 6 | $345,000 | One-third paid within 60 days of dismissal, one-third paid within 90 days of dismissal, and one-third paid within 120 days of dismissal |
| $100,001- | 6 | $1,732,000 | One-quarter paid within 60 days of dismissal, one-quarter paid within 90 days of dismissal, one-quarter paid within 120 days of dismissal, and one-quarter paid within 150 days of dismissal |

An assumption of the projections is that the Debtors' larger vendors will extend terms to the Debtors consistent with the prepetition practice of the parties. As a consequence of the chapter 11 cases, many vendors that historically provided beneficial terms significantly shortened the terms or put the Debtors on COD. A return to historical credit terms will free up significant cash flow in the months after dismissal that can be used to quickly repay prepetition claims.

As evident from the projections, the repayment plan contemplates the willingness of the handful of vendors holding large claims to (1) agree to repayment over 150 days, and (2) provide beneficial terms. In order to determine the feasibility of the repayment plan, the Debtors shared the proposed repayment plan with the Official Committee of Unsecured Creditors (the "Committee") and other large vendors whose cooperation is key to the success of the plan. Based upon discussions with these important constituencies, the Debtors believe they have universal support from their large vendors to proceed outside of chapter 11 and to repay existing claims consistent with the cash flow projection. However, the ability to operate profitably and repay claims is not dependent on universal

11

cooperation from all creditors.  As set forth in the cash flow projection, assuming the return of

historical terms, the Debtors will continually maintain $2-2.5 million in the bank as a reserve.  If the

Debtors' assumption that all of the larger vendors will cooperate proves to be too optimistic, the

Debtors will have sufficient cash reserves to make all contemplated payments in a timely manner.

## VI.

### DISMISSAL OF THE CASES IS IN THE BEST
### INTERESTS OF THE DEBTORS AND THEIR CREDITORS

A.    Dismissal Is Appropriate Pursuant To Section 305(a)(1) Of The Bankruptcy Code.

Section 305(a)(1) of the Bankruptcy Code provides that a bankruptcy court may dismiss a

bankruptcy case if "the interests of creditors and the debtor would be better served by such dismissal .

. ."  The authority to dismiss a case pursuant to section 305(a)(1) applies not only to involuntary cases

and requests by creditors, but also to requests by debtors in voluntary cases.  *See, e.g., In re

Capistrano Associat*es, 66 B.R. 421 (Bankr. S.D. Fla. 1986); *In re Colonial Ford, Inc.,* 24 B.R. 1014

(Bankr. D. Utah 1982).

In recognition that the bankruptcy process can be expensive, distracting and inefficient for an

operating business, a central purpose of section 305(a)(1) is to facilitate out-of-court workouts where

possible.  The legislative history to section 305 provides:

> The court may dismiss or suspend under the first paragraph, for example, if an
> arrangement is being worked out by creditors and the debtor out of court, there is
> no prejudice to the results of creditors in that arrangement, and an involuntary
> case has been commenced by a few recalcitrant creditors to provide a basis for
> future threats to extract full payment. The less expensive out-of-court workout
> may better serve the interests in the case.

H.R. Rep. No. 95-595 95th Cong., 1st Sees. 325, U.S. Code Cong. & Admin News, p. 6281.  *See also,

In re Colonial Ford, Inc.,* 24 B.R. at 1015 ("Section 305(a)(1) reflects a policy, embodied in several

sections of the Code, which favors "workouts": private, negotiated adjustments of creditor-company

relations.  Congress designed the Code, in large measure, to encourage workouts in the first instance,

with refuge in bankruptcy as a last resort.").

Dismissal of these chapter 11 cases is in the best interests of the Debtors and their creditors.

As a result of the acquisition of Madison's secured debt by EF and the agreement by EF to enter into

the Forbearance Agreement that will permit the payment of unsecured claims prior to the repayment of

the secured debt, the Debtors have no need to either sell their assets or to impair the claims of creditors or interests of equity holders.  Furthermore, while confirmation of a plan would take months, thereby significantly increasing administrative expenses and delaying payment to creditors, dismissal will permit payment of claims on an expedited basis.  Where a debtor can pay claims in full without the need for confirmation of a plan, dismissal is appropriate.  *See, e.g., In re Walter*, 108 B.R. 244, 251 (Bankr. C.D. Cal. 1989) ("[D]ismissal would be in the best interest of creditors because the Debtors have sufficient assets to pay off all their creditors in full and creditors would be paid in a more expedited basis outside of bankruptcy.").

      B.      <u>Dismissal Is Appropriate Pursuant To Section 1112(b) Of The Bankruptcy Code</u>.

Dismissal is also appropriate under section 1112(b) of the Bankruptcy Code, which provides that a bankruptcy court shall dismiss a chapter 11 case if the movant establishes "cause."  A debtor may request a voluntary dismissal pursuant to section 1112(b).  *See, e.g., In re OptInRealBig.com, LLC*, 345 B.R. 277, 282-83 (Bankr. D. Colo. 2006).  A request for voluntary dismissal should be granted unless a creditor can establish "legal prejudice."  *See, e.g., In re Hickman*, 384 B.R. 832, 840 (Bankr. 9th Cir. 2008).

As set forth above, the Debtors' cases were triggered by and have primarily concerned the exercise of rights and remedies by Madison.  As a consequence of the acquisition of Madison's claims by EF, the agreement of EF to the Forbearance Agreement, and the decision of EF to forbear with respect to the current sale process, the continuation of the cases serves no purpose that will benefit the Debtors, their creditors, or their equity holders.  Where the primary cause of a bankruptcy case is resolved without the need for confirmation of a plan, dismissal is appropriate.  For example, in *In re OptInRealBig.com, LLC*, 345 B.R. 277 (Bankr. D. Colo. 2006), the debtor filed bankruptcy because of significant pending litigation.  During the case, the litigation was settled.  The cause of the bankruptcy resolved, the debtor then moved for dismissal pursuant to section 1112(b).  In determining that dismissal was appropriate, the court held:

> The Debtors no longer desire to continue down the road to reorganization. The evidence makes it clear moreover that reorganization is not necessary for these Debtors. They are able to return to the marketplace and operate successfully without the assistance of the Bankruptcy Court. Reorganization is a process that is costly and time consuming for the parties and for the Court. Where there has been a material change in a debtor's circumstances, such that reorganizing under the protection of the Bankruptcy Court no longer serves the interests of a debtor

or its creditors, then the Court believes that cause exists for dismissal or conversion of the case under § 1112(b).

*See also, In re Melp, Ltd.*, 143 B.R. 890 (Bankr. E.D. Mo. 1992) (where debtor operated profitably, had resolved all disputes with third parties during case, and remaining dispute was between general partner and limited partner over control of the debtor, dismissal was appropriate upon motion of the debtor).

## VII.

## CONCLUSION

These bankruptcy cases have served their purpose. The Debtors' principals were able to locate a new lender willing to replace Madison and then entered into a very beneficial forbearance agreement that will permit the Debtors to exit chapter 11 without any need to sell assets or impair general unsecured claims or equity interests. Any delay in dismissal of these cases will only increase administrative expenses and provide no benefit to the Debtors, their creditors, or their shareholders. Therefore, the Debtors request that the Bankruptcy Court enter an order, substantially in the form attached as Exhibit C, dismissing these cases.

Dated: July 1, 2010                    PEITZMAN, WEG & KEMPINSKY LLP


By:___/s/ David B. Shemano_____
        David B. Shemano
    Counsel for the Debtors and Debtors in Possession

## <u>DECLARATION OF GERARD A. THOMPSON</u>

I, Gerard A. Thompson, declare as follows:

1.      I am the Chief Financial Officer of the debtors and debtors in possession in the above-referenced jointly administered chapter 11 bankruptcy case (the "Debtors"). I have personal knowledge of the facts set forth herein, and if called upon to testify as a witness, I could and would do so.

2.      The Debtors are organized as a corporate group (the "Company") under Home Organizers, Inc. ("HOI"), which is the parent company of its subsidiary entities, Closet World, Inc., CBD Franchising, Inc., Closets By Design, Inc., Closet Dimensions, Inc., Home Closets, Inc., CBD Las Vegas, LLC, and Closet World Arizona, LLC (collectively, the "Subsidiary Debtors").  The Company is one of the largest custom closet and other home organization system companies in the United States with several name brands, a nationwide franchise network, over 500 employees in California, and over $46 million in revenues last year.

3.      The Debtors and Madison Capital Funding LLC ("Madison") entered into a financing arrangement pursuant to a Credit Agreement dated as of June 30, 2004 (including all amendments, the "Credit Agreement"), in which Madison, as Lender and Agent, provided the Debtors with a revolving loan facility up to the maximum principal amount of $8,000,000, plus term loans in the principal amount of $13,500,000.  As of March 18, 2010, the Debtors were indebted to Madison under the Credit Agreement in the amount of $8,163,422.98 plus certain fees and costs (the "Indebtedness").  To secure advances under the Credit Agreement, the Debtors granted Madison a lien on substantially all of their assets, including a lien on HOI's equity interests in the Subsidiary Debtors.  In addition, Frank Melkonian ("Melkonian"), the Debtors' CEO, Chairman of the Board, and controlling common stockholder, executed a non-recourse pledge granting Madison a lien on his equity interest in HOI to secure the Indebtedness.

4.      Certain events of default under the Credit Agreement occurred in 2009, including the expiration of the term of the Credit Agreement without the repayment of all amounts outstanding.  The Debtors worked in good faith with Madison to address the events of default and effectuate a restructuring of the Credit Agreement.  However, on March 9, 2010, Madison gave notice (the "Notice") that it was exercising its purported rights under stock pledge agreements to prohibit HOI

from exercising any voting rights with respect to the equity interests in the Subsidiary Debtors until the Company cured all defaults, and that, instead, Madison would exercise the voting rights. Pursuant to the Notice, Madison purported to exercise the voting rights to replace the existing directors of the Subsidiary Debtors with a new director chosen by Madison, Tony Natale ("Natale"). Additionally, on March 9, 2010, Madison sent a notice to Melkonian, HOI's controlling shareholder, informing Melkonian that, effective March 23, 2010, Madison intended to exercise its voting rights under his pledge agreement to remove all existing directors of HOI and elect a single new director selected by Madison.

5.      While the Company disputed that Madison properly exercised its rights and remedies with respect to the equity interests and disputed that Natale was properly appointed, the Debtors continued to work in good faith with Madison to reach a consensual resolution. However, on or about March 12, 2010, Madison swept the Company's bank accounts of approximately $1.6 million in cash. Then, on March 16, 2010, without any notice to the Company, Madison obtained a temporary restraining order from a State Court in Cook County, Illinois, that purported to enjoin, among other entities, HOI from exercising any rights or taking any actions inconsistent with (i) the Notice, and (ii) the rights and obligations of Natale, including wrongfully filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code on behalf of the Subsidiary Debtors without the consent of Natale.

6.      While the Company believed that Madison's exercise of purported rights and remedies was improper and that the temporary restraining order issued in Illinois was invalid and of no effect, the Company concluded that bankruptcy protection was required in order to protect the Company's assets and the interests of creditors other than Madison. Therefore, on March 16, 2010, HOI commenced its chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. HOI then issued shareholder resolutions removing Natale as director of the Subsidiary Debtors (to the extent he was ever actually appropriately appointed) and reinstating the prior directors. The reinstated directors then authorized the chapter 11 filings for the Subsidiary Debtors. On March 18, 2010, each of the Subsidiary Debtors commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.      On March 19, 2010, HOI filed a complaint for declaratory and injunctive relief to enjoin Madison from exercising purported voting rights to replace Melkonian as the director of HOI, thereby commencing an adversary proceeding before this Court (Adv. Case No. 2:10-01504-RN) (the "Adversary Action").

8.      On March 19, 2010, Madison filed a motion for relief from stay in the HOI chapter 11 case (the "Stay Relief Motion") and a motion to dismiss with respect to each chapter 11 case commenced by the Subsidiary Debtors (the "Dismissal Motion").  The Debtors filed oppositions to the Stay Relief and Dismissal Motion.

9.      On or about April 6, 2010, the Debtors and Madison reached agreement on a stipulated settlement order resolving all issues raised by the Adversary Action, Stay Relief Motion and Dismissal Motion (the "Settlement Order").  The Bankruptcy Court initially entered the Settlement Order on April 27, 2010.  Pursuant to a motion for clarification filed by Tony Natale, the Bankruptcy Court entered a revised Settlement Order on May 26, 2010.

10.     Pursuant to the Settlement Order, among other things, the Debtors agreed to a timetable by which they were required to undertake and accomplish certain actions toward the ultimate consummation of a sale of their businesses and payoff of Madison's claims no later than July 30, 2010 (the "Sale Milestones") in the event no other consensual resolution with Madison was reached.  In the event that the Debtors failed to satisfy the Sale Milestones or the occurrence of another "Board Replacement Event," as described in the Settlement Order, the Debtors and Melkonian agreed that (a) the directors then serving on the boards of directors of the Debtors organized as a corporation shall be deemed removed and replaced with Natale as the sole director, and (b) the limited liability company agreements of the Debtors organized as limited liability companies shall be replaced with limited liability company agreements approved by Natale.

11.     On May 26, 2010, the Bankruptcy Court entered a stipulated cash collateral order authorizing the Debtors to use Madison's cash collateral (the "Cash Collateral Order").  The Cash Collateral Order provides, among other adequate protection granted to Madison, that the failure of the Debtors to satisfy a Sale Milestone or the occurrence of another Board Replacement Event is an event of default entitling Madison to exercise its rights and remedies as set forth in the Cash Collateral Order.

12.     The Debtors diligently complied with all Sale Milestones and avoided the occurrence of all Board Replacement Events set forth in the Settlement and Cash Collateral Orders.

13.     Concurrently with the sale process demanded by Madison, Melkonian endeavored to locate a new lender willing to assume Madison's position as secured lender and permit the Debtors to exit chapter 11 without the necessity of a sale of the Debtors' assets to a third party.  On or about June 10, 2010, EF acquired all of Madison's claims against the Debtors.  While Melkonian, I and other insiders are minority members of EF (either individually or through limited liability companies), the managing member and majority of the members are not insiders or affiliates of the Debtors and EF is represented by independent counsel.

14.     Promptly after the acquisition, the Debtors and EF had discussions concerning the status of the chapter 11 cases and how to proceed.  EF extended all Sale Milestones for 60 days to permit the Debtors adequate time to consider all strategic options.

15.     On June 11, 2010, the Debtors' Board held a meeting, which was attended by, among others, all current Board members (Frank Melkonian, me, Jerry Egner, and Alex Jivalagian), the Debtors' bankruptcy counsel (Peitzman Weg & Kempinsky LLP), corporate counsel (Reeder Lu LLP), Chief Restructuring Officer (Tony Natale), and investment bankers (FocalPoint).  While Melkonian and I attended the meeting, Melkonian was excluded from certain discussions and did not vote because of potential conflicts arising from his submission of a sale offer and minority interest in EF, and Thompson did not vote on certain matters because of potential conflicts arising from his minority interest in EF.

16.     At the meeting, among other items of discussions, FocalPoint presented to the Board a detailed summary and analysis of the sale offers received, and the Debtors' counsel informed the Board of the details concerning EF's (a) acquisition of Madison's secured claims, (b) immediate 60-day extension of the Sale Milestones, and (c) expressed intention to negotiate a forbearance agreement that would permit the Debtors to exit chapter 11 quickly, satisfy the claims of unsecured creditors, and leave equity holders unimpaired.

17.     After extended discussion, the Board voted to not to pursue any of the pending sale offers and instead concluded that it was in the best interests of the Company, its creditors and shareholders to immediately commence forbearance discussions with EF and execute a forbearance

agreement as soon as possible that would comfortably allow the Debtors to exit chapter 11 as soon as possible.

18.     In the weeks after the Board meeting, the Debtors and EF negotiated in good faith and at arms'-length a forbearance agreement, which was finalized and executed on July 1, 2010.  A true and correct copy of the agreement is attached as Exhibit A.  Because Melkonian and I are members of EF, Mary Reiman, the Company's Executive Vice President, was the Company officer responsible for the negotiations.

19.     Pursuant to the Forbearance Agreement, the Debtors will not be required to make any principal payments on their secured debt until January 2012 at the earliest.  Consequently, the Debtors will have sufficient cash flow in the coming months to both timely satisfy administrative expense and prepetition claims, and remain current with their vendors and other creditors.  The Debtors have worked with FocalPoint to prepare a cash flow projection that demonstrates their capability to operate outside of the protection of chapter 11.  A copy of the cash flow projection is attached as Exhibit B.

20.     Based upon my experience as CFO for the Debtors, the projection reflects relatively conservative assumptions and I expect that the Debtors' actual performance in the coming months will be better than projected.

21.     An assumption of the projections is that the Debtors' larger vendors will extend terms to the Debtors consistent with the prepetition practice of the parties.  As a consequence of the chapter 11 cases, many vendors that historically provided beneficial terms significantly shortened the terms or put the Debtors on COD.  A return to historical credit terms will free up significant cash flow in the months after dismissal that can be used to quickly repay prepetition claims.

22.     In order to determine the feasibility of the repayment plan, the Debtors shared the proposed repayment plan with the Official Committee of Unsecured Creditors and other large vendors whose cooperation is key to the success of the plan.  Based upon discussions with these important constituencies, the Debtors believe they have universal support from their large vendors to proceed outside of chapter 11 and to repay existing claims consistent with the cash flow projection.  However, the ability to operate profitably and repay claims is not dependent on universal cooperation from all creditors.  As set forth in the cash flow projection, assuming the return of historical terms, the Debtors will continually maintain $2-2.5 million in the bank as a reserve.  If the Debtors' assumption that all of

1  the larger vendors will cooperate proves to be too optimistic, the Debtors will have sufficient cash

2  reserves to make all contemplated payments in a timely manner.

3       I declare under penalty of perjury that the foregoing is true and correct.

4       Executed this 1st day of July, 2010, at Whittier, California.

Gerard A. Thompson

## DECLARATION OF ALEXANDER STEVENSON

I, Alexander Stevenson, declare as follows:

1.      I have personal knowledge of the facts set forth herein, and if called upon to testify as a witness, I could and would do so.

2.      I graduated cum laude from Michigan State University with a bachelor's degree in accounting.  I am a member of the American Bankruptcy Institute, the Turnaround Management Association, and the Association for Corporate Growth. I also hold a CIRA designation from the Association of Insolvency and Restructuring Advisors.

3.      I am currently a Managing Director of FocalPoint Securities, LLC ("FocalPoint"), where I manage the special situation and restructuring practice.  I have specialized in advising companies and their various stakeholder groups in special and distressed situations for approximately 15 years.  During my career, I have initiated, designed, and executed various strategic and transaction alternatives on behalf of companies and creditor groups, including distressed M&A and financing transactions (debt and equity), as well as both in and out of court financial restructurings.  In addition, and as part of many of my assignments, I have prepared, reviewed and/or analyzed cash flow forecasts, financial projections and business plans, including but not limited to the reasonableness of underlying assumptions and risks and opportunities inherent therein.

4.      Prior to joining FocalPoint, I was Co-Head of Corporate Finance for XRoads Solutions Group, a national middle market turnaround management and restructuring advisory firm.  Earlier in my career, I was a Managing Director with Ernst & Young Corporate Finance, LLC. Notable public or concluded situations in which I have provided investment banking and financial advisory services include Magic Brands (dba Fuddruckers); Fleetwood Enterprises; LandSource Communities Development LLC; MetroOne Telecommunications; M&R Textile Equipment; Spectrum Restaurant Group; Functional Restoration Medical Group; Winn-Dixie Stores, Proactive Packaging, Gateway Container Leasing Corporation, Flow Industries, Komag Corporation, Consolidated Freightways, Metricom, Yipes Telecommunications, APS Holding, Geneva Steel Corporation, Edwards Theatre Circuit, Totes Isotoner, and Montgomery Ward.

5.      I am informed that the Bankruptcy Court entered an order resolving disputes between Madison Capital Funding LLC ("Madison") and the Debtors (the "Settlement Order").  Pursuant to the

Settlement Order, the Debtors agreed to a timetable by which they were required to undertake and accomplish certain actions toward the ultimate consummation of a sale of their businesses and payoff of Madison's claims no later than July 30, 2010 (the "Sale Milestones").

6.      One of the Sale Milestones was the Debtors' engagement of FocalPoint to market the Debtors' businesses for sale.  Pursuant to an engagement letter dated April 12, 2010, which was approved by the Bankruptcy Court by Order entered on May 19, 2010, the Debtors engaged FocalPoint to be their investment bankers in these cases.

7.      Commencing in mid-April and continuing through early June, FocalPoint marketed the Debtors' businesses and solicited bids.  The Debtors fully cooperated with FocalPoint's efforts to market and sell the businesses.

8.      On or before May 28, 2010, FocalPoint received several letters of intent for the purchase of the Debtors' businesses, which satisfied one of the Sale Milestones.

9.      After receiving the letters of intent in late May, FocalPoint solicited more detailed asset purchase agreements from the bidders that submitted letters of intent in order to satisfy the next Sale Milestone of June 25, 2010, by which date the Debtors were required to have entered into an asset purchase agreement and file a sale motion.  In early June, FocalPoint received three proposed asset purchase agreements, including one bid submitted by Melkonian.  While the bids differed in format, details, contingencies and risks, the bids had the following proposed terms in common: (1) satisfaction of the Madison debt, (2) satisfaction of administrative expenses, and (3) no value or payment to equity holders.  With respect to general unsecured claims, each of the bids provided for the assumption of unsecured claims and satisfaction over several months, but differed in the scope of claims assumed and the timing of the satisfaction.

10.     On June 11, 2010, I attended a meeting of the Debtors' Board of Directors.  At the meeting, among other items of discussions, FocalPoint presented to the Board a detailed summary and analysis of the sale offers received.  Also at the meeting, the Debtors' counsel informed the Board of the details concerning Exclusive Funding LLC's ("EF") acquisition of Madison's secured claims.

11.     After extended discussion, the Board voted to not to pursue any of the pending sale offers and instead concluded that it was in the best interests of the Company, its creditors and shareholders to immediately commence forbearance discussions with EF and execute a forbearance

agreement as soon as possible that would comfortably allow the Debtors to exit chapter 11 as soon as possible (the "EF Alternative").

12.    Based on my analysis of the bids received and my understanding of the terms of the EF Alternative, I believe that the EF Alternative, if consummated, is a more favorable outcome for the Company's unsecured creditors and equity holders. Each of the proposed asset purchase agreements provided no value for equity holders and, while each contemplated the assumption of a substantial amount of unsecured claims, the bidders retained the right to modify the list of assumed prepetition debts prior to closing, therefore increasing the risk that at least some unsecured creditors would receive a de minimis recovery at best. Furthermore, contingent and unscheduled unsecured claims were not contemplated to be assumed by the bidders. In contrast, the EF Alternative leaves all unsecured creditors and equity holders unimpaired.

13.    The Debtors requested that FocalPoint assist in reviewing cash flow forecasts, financial projections and certain other financial reports prepared by the Company in contemplation that the Debtors would be exiting chapter 11 in the near future and be required to repay administrative expenses and prepetition general unsecured claims as fast as possible.

14.    Attached as Exhibit B is a copy of the cash flow projection through December 31, 2010, prepared by the Company and reviewed by FocalPoint. While FocalPoint did not audit or compile the data used to prepare Exhibit B, FocalPoint reviewed supporting information provided by management, including supporting financial and operating projections, historic and recent sales and margin trends, and analyses of historic and recent accounts payable ratios. In addition, due to the assumption in Exhibit B that (a) vendors will extend terms to the Debtors consistent with the prepetition practice of the parties and (b) that creditors will agree to payments of prepetition debts over time, I personally spoke with three of the largest vendors whose cooperation was assumed by the projections. The three vendors represent approximately 41.6% of the outstanding scheduled prepetition general unsecured claims and 61% of combined materials and advertising related purchases in 2009. Further, FocalPoint has relied solely on management representations as to the timing and amount of the tax refund contemplated to be received in September 2010.

15.    The conclusions reflected below are based on the specific work performed as described in Paragraph 14 based on materials provided by the Company that contain forward looking statements.

Forward looking statements involve risks and uncertainties which could cause actual results to differ materially from the estimates and forecasts either positively or negatively. Further, the forward looking statements are subject to significant business, economic, regulatory and competitive uncertainties and contingencies that are not within the control of FocalPoint or any other party. Nothing in this Declaration is or shall be construed to be a representation, warranty or guarantee by FocalPoint that the cash flows reflected in Exhibit B will actually be achieved.

16.    Based upon my experience as a financial advisor, FocalPoint's work with the Debtors since April 2010, and the specific work performed in reviewing and analyzing Exhibit B noted above, I believe that the cash flow projection attached as Exhibit B reflects reasonable business assumptions and that it is feasible that (i) the results therein will be achieved and (ii) that the payments contemplated therein can be made as scheduled.

17.    The projection assumes the Debtors' compliance with the terms of the forbearance agreement negotiated with EF. To avoid default under the forbearance agreement, the Debtors must satisfy monthly EBITDA covenants set forth in the forbearance agreement. Based upon my experience as a financial advisor, FocalPoint's work with the Debtors since April 2010, and the specific work noted above, I believe that the EBITDA covenant is set at a reasonable level to provide flexibility for the business and is within market norms. In fact, the minimum EBITDA covenant is set at a level that the Debtors will be able to satisfy even if the actual EBITDA from July 2010 through December 2010 is only 35% of that projected by the Debtors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of July, 2010 at Los Angeles, California.


Alexander Stevenson

# EXHIBIT A

## FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT ("**Forbearance Agreement**") is dated as of July 1, 2010, by and among Home Organizers, Inc., a Delaware corporation ("**Borrower**"), Home Closets, Inc., a California corporation, CBD Franchising, Inc., a California corporation, Closets by Design, Inc., a California corporation, Closet World, Inc., a Delaware corporation, Closet Dimensions, Inc., a California corporation, CBD Las Vegas LLC, a Nevada limited liability company, and Closet World Arizona, LLC, a Nevada limited liability company, the Lenders party to the Credit Agreement described below ("**Lenders**"), and Exclusive Funding LLC ("**Exclusive**"), as Agent for the Lenders (the "**Agent**").

<u>RECITALS:</u>

WHEREAS, Madison Capital Funding LLC, as agent for the lenders, the then lenders under the Credit Agreement and Borrower entered into certain financing arrangements pursuant to a certain Credit Agreement dated as of June 30, 2004 (as such agreement may have been or may hereafter be amended, supplemented or otherwise modified from time to time in accordance with its terms, the "**Credit Agreement**");

WHEREAS, the Borrower filed for bankruptcy protection on March 16, 2010, and the Borrower's subsidiaries filed for bankruptcy protection on March 18, 2010 (collectively, the "**Bankruptcy Cases**");

WHEREAS, on or about June 10, 2010, Exclusive acquired the loans and all rights and interests of the then lenders (collectively, the "**Original Lenders**") under the Credit Agreement and related documents and became the Agent under the Credit Agreement and related documents (the "**Loan Acquisition**");

WHEREAS, in connection with the Loan Acquisition, Lenders advanced the additional sum of $1,013,623, to reimburse Original Lenders for amounts claimed due and payable under the Credit Agreement as of the date thereof;

WHEREAS, as of the date hereof, certain Events of Default are in existence under the Credit Agreement, and certain additional Events of Default are anticipated to occur, as more particularly described below;

WHEREAS, Borrower has requested that Lenders forbear from exercising their rights and remedies as a result of such Events of Default during the Forbearance Period (as defined below) and that Lenders agree to amend the Credit Agreement in certain respects as specified herein during the Forbearance Period notwithstanding such Events of Default; and

WHEREAS, Lenders are willing to accommodate the foregoing requests of Borrower on and subject to the terms and conditions specified herein;

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

1.1         **Interpretation.** All capitalized terms used herein and not otherwise defined herein (including the preamble and recitals hereto) shall have the respective meanings ascribed thereto in Credit Agreement.

1.2         **Additional Definitions.** As used herein, the following terms shall have the respective meanings given to them below;

        (a)         "**Specified Defaults**" shall mean the Events of Default that have occurred through the date hereof, or are anticipated to occur during the Forbearance Period, in each case as more particularly identified on Exhibit A hereto.

        (b)         "**Forbearance Period**" shall have the meaning set forth in Section 3.2(a) hereof.

## SECTION 2. ACKNOWLEDGMENTS

2.1         **Acknowledgment of Obligations.** Borrower hereby acknowledges, confirms and agrees that as of the close of business on June 30, 2010, (a) Borrower is indebted to Lenders in respect of the Revolving Loans in the principal amount of $3,650,000, (b) Borrower is indebted to Lenders in respect of the Term A Loans in the principal amount of $1,350,000, (c) Borrower is indebted to Lenders in respect of Term B Loans in the principal amount of $3,500,000 and (d) Borrower is indebted to Lenders in respect of Letters of Credit in the principal amount of $300,000. All such Obligations, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by Borrower to Lenders (and any other Obligations), are unconditionally owing by Borrower to Lenders, without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2         **Acknowledgment of Security Interests.** Borrower hereby acknowledges, confirms and agrees that Agent, on behalf of itself and the Lenders, has and shall continue to have valid, enforceable and perfected first-priority liens upon the security interests in the Collateral heretofore granted to Agent pursuant to the Collateral Documents or otherwise granted to or held by Agent, subject only to the Liens permitted under Section 7.2 of the Credit Agreement.

2.3         **Binding Effect of Documents.** Borrower hereby acknowledges, confirms and agrees that: (a) each of the Loan Documents to which it is a party has been duly executed and delivered to Agent by Borrower, and each is and shall remain in full force and effect, (b) the agreements and obligations of Borrower contained in such documents and in this Forbearance Agreement constitute the legal, valid and binding Obligations of the enforcement of such Obligations, and (c) Lenders are and shall be entitled to the rights, remedies and benefits provided for under the Loan Documents and applicable law.

## SECTION 3. FORBEARANCE IN RESPECT OF SPECIFIED DEFAULTS

3.1         **Acknowledgment of Default.** Borrower hereby acknowledges and agrees that the Specified Defaults have occurred and are continuing (other than the Specified Defaults that

have not yet occurred, but are anticipated to occur during the Forbearance Period, as set forth on Exhibit A hereto), which constitute Events of Default and entitle Lenders to exercise their rights and remedies under the Loan Documents, applicable law or otherwise.  Borrower further represents and warrants that, after giving effect to the terms hereof, as of the date hereof no other Events of Default under the Loan Documents exist.  Lenders have not waived any of the Specified Defaults, do not intend to waive such Specified Defaults, and nothing contained herein or the transactions contemplated hereby shall be deemed to constitute any such waiver.  Borrower hereby acknowledges and agrees that Lenders have the exercisable right to declare the Obligations to be immediately due and payable under the terms of the Loan Documents.

3.2        **Forbearance.**

(a)    In reliance upon the representations, warranties and covenants of Borrower contained in this Forbearance Agreement, and subject to the terms and conditions of this Forbearance Agreement and any documents or instruments executed in connection herewith, Lenders Agree to forbear from exercising their rights and remedies under the Loan Documents or applicable law in respect of or arising out of the Specified Defaults, for the period (the "**Forbearance Period**") commencing on the Effective Date (as defined below) and ending on the date which is the earliest of: (i) the date that is eighteen (18) months from the date of the Dismissal Order (as defined below), (ii) the occurrence or existence of any Event of Default, other than the Specified Defaults, or (iii) Borrower's breach of any of the provisions of Section 4 hereof; provided that Lenders shall have the right to immediately terminate the Forbearance Period if the order of the bankruptcy court contemplated by Section 6(c) is appealed.  The foregoing shall not be deemed to permit the making of any payments (including, without limitation, payments under the Management Agreement) that are prohibited under the terms of the Credit Agreement during the existence of an Event of Default.

(b)    Upon the termination of the Forbearance Period, the agreement of Lenders to forbear shall automatically and without further action terminate and be of no force and effect, it being expressly agreed that the effect of such termination will be to permit Lenders to exercise immediately all rights and remedies under the Financing Agreement and applicable law, including, but not limited to, (i) ceasing to make any further Loans, (ii) accelerating all of the Obligations and (iii) foreclosing on the Collateral; in each case without any further notice, passage of time or forbearance of any kind.

(c)    The date set forth in Section 3.2(a)(i) can be extended no more than two times for an additional six months for each such extension upon the satisfaction of each of the following conditions (i) the request of Borrower by written notice ("**Extension Notice**") to the Agent no less than 15 Business Days prior to the date then referenced in Section 3.2(a)(i) as may have then been extended, (ii) the payment of an additional forbearance fee of 1.0% of the outstanding Obligations, (iii) the representations and warranties in this Forbearance Agreement shall be true and correct as of the date hereof, as of the date of the applicable Extension Notice and as of the date of the actual extension, (iv) no Events of Default shall have occurred or shall occur due to such extension, other than in each case the Specified Defaults, (v) Borrower shall have provided Agent with twelve (12) month trailing EBITDA projections for such six month extension period, which projection shall be acceptable to Agent in its sole and absolute discretion,  (vi) the Fixed Charge Coverage Ratio shall equal or exceed 1.00:1.00, and (vii)

Borrower and Agent shall have agreed in writing to reset the Financial Covenants in Section 7.14 of the Credit Agreement in amounts acceptable to Agent.

3.3      **No Other Waivers; Reservation of Rights.**

(a)      Lenders have not waived, are not by this Forbearance Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Specific Defaults or otherwise), and Lenders have not agreed to forbear with respect to any of their rights or remedies concerning any other Events of Default (other than, during the Forbearance Period, the Specified Defaults to the extent expressly set forth herein), occurring at any time.

(b)      Subject to Section 3.2 above (solely with respect to the Specified Defaults), Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time.  Lenders have not waived any of such rights or remedies, and nothing in this Forbearance Agreement, and no delay in the exercise of any such rights or remedies, should be construed as a waiver of any such rights or remedies.

**SECTION 4.  PERMANENT AMENDMENT; SUPPLEMENTAL PROVISIONS.**

4.1      **Revolving Loan Commitment.**  During the Forbearance Period, Borrower shall be permitted to draw under the Revolving Loan Commitment in accordance with the terms of the Credit Agreement, in an amount not to exceed the Borrowing Availability, if Agent determines, in its sole and absolute discretion, that (a) no Events of Default shall have occurred or shall occur due to such extension, other than in each case the Specified Defaults, (b) twelve (12) months trailing EBITDA shall be greater than the amount set forth in Borrower's EBITDA projections covering such period as may be  approved in writing by Agent, and (c) the Fixed Charge Coverage Ratio shall equal or exceed 1.0:1.0.

4.2      **Interest Rate on Loans.**  Commencing as of June 9, 2010 and continuing during the Forbearance Period and for all periods thereafter, all Loans shall bear interest at a rate per annum equal to fourteen and one-quarter percent (14.25%) payable monthly in arrears on the first day of each month commencing on the first day of the month after the Effective Date.  This interest rate during the Forbearance Period shall be in lieu of the accrual of the default rate of interest that would otherwise automatically occur pursuant to Section 2.7.1 of the Credit Agreement as a result of the Specified Defaults.

4.3      **Fees.**  Commencing as of June 9, 2010 and continuing during the Forbearance Period and for all periods thereafter, Borrower shall pay to the Agent for the account of each Lender:

(a)      a management and maintenance fee equal to 1.0% per annum of the aggregate Commitments payable monthly on the first day of the month after the Effective Date, and

(b)      a forbearance fee equal to 1.0% per annum of the then outstanding Obligations payable monthly on the first day of the month after the Effective Date.

4.4          **Minimum EBITDA Covenant**.  Borrower shall not permit EBITDA for the trailing twelve month period ending on any of the month-end dates below (calculated in a manner that excludes (a) charges incurred regarding the settlement of the Williams class-action lawsuit, (b) charges incurred regarding retrospective workers compensation billings, (c) charges, fees and expenses incurred in connection with the filing, administration and dismissal of the Bankruptcy Cases, including, without limitation, investment banking fees, fees payable to any chief restructuring officer, attorneys' fees (including attorneys' fees payable to counsel for the creditors committee for Borrower), (d)  any attorneys' fees and expenses incurred after the dismissal of the Bankruptcy Cases in excess of the budget approved by Agent in writing, and (e) charges incurred in respect of fees and expenses of legal counsel to Agent for the preparation and negotiation of this Forbearance Agreement and the items contemplated hereby) to be less than the applicable amount set forth opposite of such date:

| Trailing Twelve-Month Period Ending | EBITDA |
| --- | --- |
| July 31, 2010 | $500,000 |
| August 31, 2010 | $500,000 |
| September 30, 2010 | $900,000 |
| October 31, 2010 | $1,100,000 |
| November 30, 2010 | $1,400,000 |
| December 31, 2010 | $1,400,000 |
| January 31, 2011 | $1,400,000 |
| February 28, 2011 | $1,400,000 |

| | |
|---|---|
| March 31, 2011 | $1,500.000 |
| April 30, 2011 | $2,400,000 |
| May 31, 2011 | $2,500,000 |
| June 30, 2011 | $2,600,000 |
| July 31, 2011 | $2,700,000 |
| August 31, 2011 | $2,850,000 |
| September 30, 2011 | $2,950,000 |
| October 31, 2011 | $3,100,000 |
| November 30, 2011 | $3,200,000 |
| December 31, 2011 | $3,300,000 |
| January 31, 2012 | $3,300,000 |

4.5         **Completed Collateral Questionnaire; Updated Bank Account Information**. No later than two (2) Business Days prior to the Effective Date, Borrower shall deliver to Agent a completed Collateral Questionnaire in substantially the form attached hereto as Exhibit B, which shall include responses and information that are correct and complete in all material respects. No later than two (2) Business Days prior to the Effective Date, Borrower shall deliver to Agent an updated listing of the deposit accounts and other bank accounts of the Loan Parties (and, to the extent applicable, Borrower shall take such action as may be reasonably necessary to cause all such accounts to be subject to Agent's control in accordance with the Collateral Documents).

## SECTION 5. REPRESENTATIONS AND WARRANTIES

Borrower hereby represents, warrants and covenants as follows:

5.1         **Representations in Loan Documents**.    Each of the representations and warranties made by or on behalf of Borrower to Lenders or Agent in any of the Loan Documents was true and correct when made, and is, except for the Specified Defaults, true and correct on and as of the date of this Forbearance Agreement with the same full force and effect as if each of such representations and warranties had been made by Borrower on the date hereof and in this Forbearance Agreement.

5.2        **Binding Effect of Documents.**  This Forbearance Agreement has been duly authorized, executed and delivered to Agent and Lenders by Borrower, is enforceable in accordance with its terms and is in full force and effect.

5.3        **No Conflict.**  The execution, delivery and performance of this Forbearance Agreement by Borrower will not violate any requirement of law or contractual obligation of Borrower or Guarantors and will not result in, or require, the creation or imposition of any Lien on any of their properties or revenues.

## SECTION 6. CONDITIONS TO EFFECTIVENESS OF CERTAIN PROVISIONS OF THIS FORBEARANCE AGREEMENT

The effectiveness of the terms and provisions of Section 3.2 of this Forbearance Agreement shall be subject to the prior satisfaction of the following conditions (the date upon which the last condition set forth in this Section 6 is satisfied to be known as the "**Effective Date**"):

(a)        Agent shall have received an original of this Forbearance Agreement, duly authorized, executed and delivered by Borrower;

(b)        Borrower and the other Loan Parties shall have executed and delivered to Agent the Reaffirmation of Guarantee and Collateral Agreement attached hereto as Exhibit C; and

(c)        the Bankruptcy Cases of the Borrower and its subsidiaries shall have been dismissed as evidenced by an effective order of the applicable bankruptcy court overseeing the Bankruptcy Cases which order is not stayed (the "**Dismissal Order**").

## SECTION 7. MISCELLANEOUS

7.1        **Effect of Forbearance Agreement.**  Except as modified pursuant hereto, no other changes or modification to the Loan Documents are intended or implied and in all other respects the Loan Documents hereby are ratified, restated and confirmed by all parties hereto as of the effective date hereof.  To the extent of conflict between the terms of this Forbearance Agreement and the other Loan Documents, the terms of this Forbearance Agreement shall govern and control.  The Credit Agreement and this Forbearance Agreement shall be read and construed as one agreement.

7.2        **Costs and Expenses.**  Borrower agrees to pay to Agent, on demand by Agent at any time, whether or not all or any of the transactions contemplated by this Forbearance Agreement are consummated; all reasonable fees and disbursements of any counsel to Agent and Lenders in connection with the preparation, negotiation, execution, or delivery of this Forbearance Agreement and any agreements contemplated hereby and expenses which shall at any time be incurred or sustained by Agent or Lenders or any participant of Lenders or any of their respective directors, officers, employees or agents as a consequence of or in any way in connection with the preparation, negotiation, execution, or delivery of this Forbearance Agreement and any agreements contemplated hereby.

7.3     **Further Assurances.** At Borrower's expense, the parties hereto shall execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Forbearance Agreement.

7.4     **Successors and Assigns.**    This Forbearance Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

7.5     **Survival of Representations and Warranties.**    All representations and warranties made in this Forbearance Agreement or any other document furnished in connection with this Forbearance Agreement shall survive the execution and delivery of this Forbearance Agreement and the other documents, and no investigation by Agent or Lenders or any closing shall affect the representations and warranties or the right of Agent and Lenders to rely upon them.

7.6     **Release.**

        (a)     In consideration of the agreements of Agent and Lenders contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and the other Loan Parties, on behalf of themselves and their successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably release, remise and forever discharge Agent and Lenders (and their successors and assigns in such respective capacities as Agent and Lenders and not in other capacities which any such successors and assigns may have or may have had), and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Agents and Lenders and all such other Persons being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"),of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities and whatsoever (individually, a "**Claim**" and collectively, "**Claims**") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which Borrower, any of the other Loan Parties or any of their successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Forbearance Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with this Forbearance Agreement, the Credit Agreement, or any of the other Loan Documents or transactions contemplated hereby or thereby.

        (b)     It is further understood and agreed that any and all rights under the provisions of Section 1542 of the California Civil Code are expressly waived by Borrower and each other Loan Party.  Section 1542 of the California Civil Code provides as follows:

        "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(c)     Borrower and the other Loan Parties understand, acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(d)     Borrower and other Loan Parties agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

7.7     **Covenant Not to Sue.** Borrower and the other Loan Parties, on behalf of themselves and their successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Borrower and the other Loan Parties pursuant to Section 7.6 above. If Borrower or any of the other Loan Parties or any of their successors, assigns or other legal representations violates the foregoing covenant, Borrowers and the other Loan Parties, for themselves and their successors, assigns and legal representative agree to pay in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.8     **Severability.** Any provision of this Forbearance Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Forbearance Agreement the intent of the parties being that such provision be reformed as minimal as necessary to be valid and enforceable but to reflect the intent of the parties as shown by this Agreement.

7.9     **Reviewed by Attorneys.** Borrowers and the other Loan Parties represent and warrant to Agent and Lenders that they (a) understand fully the terms of this Forbearance Agreement and the consequences of the execution and delivery of this Forbearance Agreement, (b) have been afforded an opportunity to discuss this Forbearance Agreement with, and have this Forbearance Agreement reviewed by, such attorneys and other persons as Borrowers and the other Loan Parties may wish, and (c) have entered into this Forbearance Agreement and executed and  delivered all documents in connection herewith of their own free will and accord and without threat, duress or other coercion of any kind by any Person.   The parties hereto acknowledge and agree that neither this Forbearance Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Forbearance Agreement and the other documents executed pursuant hereto or in connection herewith.

7.10     **Governing Law.** This Forbearance Agreement and the other Loan Documents, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the internal laws of the State of California, without regard to conflict of laws principles thereof.

7.11     **Consent to Jurisdiction and Venue.** Borrower and the other Loan Parties hereby submit to the nonexclusive jurisdiction of the United States District Court for the

**Exhibit A**
**Page 33**

Southern District of California and of any California State court sitting in the County of Los Angeles for purposes of all legal proceedings arising out of or relating to this Forbearance Agreement, the other Loan Documents or the transactions contemplated hereby or thereby. Borrower and the other Loan Parties irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

7.12        **Mutual Waiver of Jury Trial.**  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWER, THE OTHER LOAN PARTIES, AGENT, AND LENDERS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS FORBEARANCE AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

7.13        **Counterparts.**  This Forbearance Agreement may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

7.14        **Amendment; Modification; Waivers.**  No amendment modification or waiver of, or consent with respect to, this Forbearance Agreement shall in any event be effective unless the same shall be in writing and approved by the party against which enforcement is so sought.

[The remainder of this page intentionally left blank.]

**Exhibit A
Page 34**

IN WITNESS WHEREOF, this Forbearance Agreement is executed and delivered as of the day and year first above written.

HOME ORGANIZERS INC.

By: _____

Name: _____MARY RIEMAN_____

Title: _____EX V.P._____

HOME CLOSETS, INC.

By: _____

Name: _____MARY RIEMAN_____

Title: _____EX V.P._____

CBD FRANCHISING, INC.

By: _____

Name: _____MARY RIEMAN_____

Title: _____EX V.P._____

CLOSETS BY DESIGN, INC.

By: _____

Name: _____MARY RIEMAN_____

Title: _____EX V.P._____

CLOSET WORLD, INC.

By: _____

Name: _____MARY RIEMAN_____

Title: _____Ex V.P._____

CLOSET DIMENSIONS, INC.


By: _____

Name: _____MARY RIEMAN_____

Title: _____Ex V.P._____

CBD LAS VEGAS LLC


By: _____

Name: _____MARY RIEMAN_____

Title: _____Ex V.P._____

CLOSET WORLD ARIZONA, LLC


By: _____

Name: _____MARY RIEMAN_____

Title: _____Ex V.P._____


EXCLUSIVE FUNDING LLC,
in its capacity as a Lender and as Agent


By: _____

Name: _____

Title: _____

00030155.DOCX                    12

CLOSET WORLD, INC.

By: _____

Name: _____

Title: _____

CLOSET DIMENSIONS, INC.


By: _____

Name: _____

Title: _____

CBD LAS VEGAS LLC


By: _____

Name: _____

Title: _____

CLOSET WORLD ARIZONA, LLC


By: _____

Name: _____

Title: _____


EXCLUSIVE FUNDING LLC,
in its capacity as a Lender and as Agent

By: _____

Name: _____*VATCHE    CABAYAN*_____

Title: _____*Manager*_____

## Exhibit A

### SPECIFIED DEFAULTS

| |
|---|
| Since March 31, 2009, Borrower has failed to repay the Revolving Outstandings that exceed Borrowing Availability, as required by Section 2.10.2(b) of the Credit Agreement, resulting in an Event of Default under Section 8.1.1 of the Credit Agreement. |
| Borrower has failed to repay the remaining outstanding principal balance of the Term A Loan in full on the Term A Loan Maturity Date, as required by Section 2.11.2 of the Credit Agreement, resulting in an Event of Default under Section 8.1.1 of the Credit Agreement. |
| Borrower has failed to repay the remaining outstanding principal balance of the Term B Loan in full on the Term B Loan Maturity Date, as required by Section 2.11.3 of the Credit Agreement, resulting in an Event of Default under Section 8.1.1 of the Credit Agreement. |
| Borrower has failed to repay the remaining outstanding principal balance of the Revolving Loans in full on the Termination Date, as required by Section 2.11.1 of the Credit Agreement, resulting in an Event of Default under Section 8.1.1 of the Credit Agreement. |
| Borrower failed to meet the Fixed Charge Coverage ratio required by Section 7.14.1 of the Credit Agreement for the Computation Periods ending September 30, 2009, and December 31, 2009. |
| Borrower failed to meet the minimum trailing twelve month EBITDA amount required by Section 7.14.3 of the Credit Agreement for the Computation Periods ending June 30, 2009, September 30, 2009, and December 31, 2009, resulting in Events of Default under Section 8.1.4 of the Credit Agreement. |
| Borrower failed to meet the maximum permitted Senior Debt to EBITDA ratio under Section 7.14.2 of the Credit Agreement for the Computation Periods ending March 31, 2009, June 30, 2009, September 30, 2009 and December 31, 2009, resulting in Events of Default under Section 8.1.4 of the Credit Agreement. |
| With notice of Agent of the same, Borrower delivered financial statements for the fiscal months ended January 31, 2009, February 28, 2009, and December 31, 2009 on April 1, 2009, April 22, 2009, and February 24, 2010, respectively. |

**Exhibit B**

COLLATERAL QUESTIONNAIRE

**Exhibit C**

REAFFIRMATION OF GUARANTEE AND COLLATERAL AGREEMENT

In order to induce Agent and the Lenders to execute and deliver that certain Forbearance Agreement of even date herewith to which this Reaffirmation is attached (the "**Forbearance Agreement**"), each of the undersigned hereby reaffirms its obligations under the certain Guarantee and Collateral Agreement dated as of June 30, 2004 among the undersigned and Agent (the "**Guarantee and Collateral Agreement**").

Each of the undersigned further agrees that the Guarantee and Collateral Agreement shall remain in full force and effect following the execution and delivery of the Forbearance Agreement and that all references to the "Credit Agreement" in the Guarantee and Collateral Agreement shall be deemed to refer to the Credit Agreement as modified by the Forbearance Agreement. Except as expressly set forth in the immediately preceding sentence, the Guarantee and Collateral Agreement shall remain unmodified and in full force and effect.

In addition, by their signatures below the undersigned subsidiaries of Home Organizers Inc. hereby acknowledge and agree to the provisions of Section 7.6 through and including Section 7.12 of the Forbearance Agreement.

This Reaffirmation of Guarantee and Collateral Agreement is dated as of _____ __, 2010.

HOME ORGANIZERS INC.

By: _____
Title: _____

CBD FRANCHISING, INC.

By: _____
Title: _____

HOME CLOSETS INC.

By: _____
Title: _____

CLOSETS BY DESIGN, INC.

By: _____
Title: _____

CLOSET WORLD ARIZONA LLC

By:    CLOSET WORLD, INC.,
       Its sole member

By: _____
Title: _____

CLOSET WORLD, INC.

By: _____
Title: _____

CLOSET DIMENSIONS, INC.

By: _____
Title: _____

CLOSET WORLD, LLC

By: _____
Title: _____

CBD LAS VEGAS LLC

By:    CLOSETS BY DESIGN, INC.,
       Its sole member

By: _____
Title: _____

00030155.DOCX

# EXHIBIT B

**Home Organizers, Inc. & Subsidiaries**
**Cash Flow Projection August to December 2010**
**Base Case Revenue Projections**

| Description | Aug 2010 | Sep 2010 | Oct 2010 | Nov 2010 | Dec 2010 | Total |
|---|---|---|---|---|---|---|
| **Beginning Cash Balance (Bank)** | $ 1,500,000 | $ 1,757,505 | $ 2,512,868 | $ 2,512,324 | $ 2,596,524 | $ 1,500,000 |
| | | | | | | |
| **Cash Receipts to Debtors:** | | | | | | |
| Customer Deposits / Final Payments | 3,170,000 | 3,370,000 | 3,370,000 | 3,370,000 | 3,141,000 | 16,421,000 |
| Franchising Business Revenue | 690,000 | 695,000 | 695,000 | 695,000 | 695,000 | 3,470,000 |
| Other - IRS Tax Refund | - | 650,000 | - | - | - | 650,000 |
| **Total Receipts to Debtors** | 3,860,000 | 4,715,000 | 4,065,000 | 4,065,000 | 3,836,000 | 20,541,000 |
| | | | | | | |
| **Total Cash Inflow** | 3,860,000 | 4,715,000 | 4,065,000 | 4,065,000 | 3,836,000 | 20,541,000 |
| | | | | | | |
| **Cash Disbursements:** | | | | | | |
| Advertising | 456,579 | 456,579 | 456,579 | 456,579 | 890,000 | 2,716,314 |
| Raw Materials Purchases | 382,995 | 392,995 | 392,995 | 510,000 | 510,000 | 2,188,985 |
| Manufacturing Expenses | 9,493 | 41,135 | 41,135 | 41,135 | 41,135 | 174,033 |
| Installation Expenses | 52,208 | 57,153 | 73,610 | 73,610 | 73,610 | 330,191 |
| Factory Moving Expenses | - | - | 50,000 | 100,000 | 100,000 | 250,000 |
| Other (Class Action Settlement) | - | - | 162,000 | 162,000 | - | 324,000 |
| Subtotal | 901,275 | 947,861 | 1,176,319 | 1,343,324 | 1,614,745 | 5,983,523 |
| | | | | | | |
| **Selling, General & Administrative** | | | | | | |
| Payroll (Total Company) | 762,400 | 804,247 | 804,247 | 804,247 | 756,332 | 3,931,473 |
| Payroll Taxes, Medicare (Total Company) | 257,040 | 261,225 | 261,225 | 261,225 | 256,433 | 1,297,148 |
| Employee Medical Benefits | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 350,000 |
| Accounting / Bookkeeping / ADP Payroll | 3,100 | 3,100 | 3,100 | 3,100 | 3,100 | 15,500 |
| US Trustee - Quarterly Fees | | | | | | |
| Office Lease | 205,000 | 205,000 | 205,000 | 205,000 | 205,000 | 1,025,000 |
| Equipment Lease | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| Utilities / Alarm | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 260,000 |
| Office Supplies & copier lease | 5,525 | 5,525 | 5,525 | 5,525 | 5,525 | 27,625 |
| Credit Card Fees | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 175,000 |
| Sales Department Expenses | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 147,500 |
| Fed Ex / Messenger / Mail | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 15,000 |
| Repairs & Maintenance | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 90,000 |
| Phone | 22,800 | 22,800 | 22,800 | 22,800 | 22,800 | 114,000 |
| Computer/ IT Support | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 22,500 |
| Travel & Entertainment | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 25,500 |
| Liability, Property & Workers Comp Insurance | 132,512 | 157,929 | 171,679 | 162,929 | 157,929 | 782,977 |
| Property Taxes | - | | | | 203,000 | 203,000 |
| Licenses & Permits | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 | 30,500 |
| Senior Credit Facility Interest Expense & Fees | 116,000 | 116,000 | 116,000 | 116,000 | 116,000 | 580,000 |
| Miscellaneous Other Expense | 64,950 | 64,950 | 64,950 | 64,950 | 64,950 | 324,750 |
| Subtotal | 1,798,527 | 1,869,976 | 1,883,726 | 1,874,976 | 2,020,269 | 9,447,473 |
| | | | | | | |
| Subtotal Disbursements | 2,699,802 | 2,817,837 | 3,060,044 | 3,218,299 | 3,635,014 | 15,430,995 |
| | | | | | | |
| **Cash Surplus/(Deficit) Before Professional Fees** | 2,660,199 | 3,654,668 | 3,517,824 | 3,359,024 | 2,797,511 | 6,610,005 |
| | | | | | | |
| **Professional Fees** | | | | | | |
| Bankruptcy Counsel - Peitzman, Weg & Kempinsky | 200,000 | 125,000 | 125,000 | - | - | 450,000 |
| Special Counsel - Reeder, Lu | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 750,000 |
| Special Counsel - Squire Sanders & Dempsey | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 40,000 |
| Special Counsel - Don Drysdale | 750 | 750 | 750 | 750 | 750 | 3,750 |
| Special Counsel - Kaufman, Gilden, Robbins | 750 | 750 | 750 | 750 | 750 | 3,750 |
| Counsel for Creditors Committee | 116,194 | - | - | - | - | 116,194 |
| Financial Advisor - FocalPoint Securities | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 275,000 |
| Other Professional Fees (Tax, Audit, Appraisal) | 65,000 | 52,300 | - | - | 2,300 | 119,600 |
| Subtotal | 595,694 | 391,800 | 339,500 | 214,500 | 216,800 | 1,758,294 |
| | | | | | | |
| **Cash Surplus/(Deficit) After Professional Fees** | 2,064,505 | 3,262,868 | 3,178,324 | 3,144,524 | 2,580,711 | 4,851,711 |
| | | | | | | |
| **Unsecured Creditors** | | | | | | |
| Payments to Unsecured Creditors - Pre-petition | | | | | | |
| $1 to $10,000 (189 Vendors) | 223,000 | - | - | - | - | 223,000 |
| $10,001 to $20,000 (12 Vendors) | 84,000 | 84,000 | - | - | - | 168,000 |
| $20,001 to $40,000 (9 Vendors) | - | 118,000 | 118,000 | - | - | 236,000 |
| $40,001 to $100,000 (6 Vendors) | - | 115,000 | 115,000 | 115,000 | - | 345,000 |
| Over $100,000 (6 Vendors) | - | 433,000 | 433,000 | 433,000 | 433,000 | 1,732,000 |
| Total | 307,000 | 750,000 | 666,000 | 548,000 | 433,000 | 2,704,000 |
| | | | | | | |
| **Ending Cash Balance (Bank)** | $ 1,757,505 | $ 2,512,868 | $ 2,512,324 | $ 2,596,524 | $ 2,147,711 | $ 2,147,711 |

# EXHIBIT C

1  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
2  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
3  Monsi Morales (State Bar No. 235520)
   *mmorales@pwkllp.com*
4  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
5  Los Angeles, CA  90067
   Telephone: (310) 552-3100
6  Facsimile:  (310) 552-3101

7  Counsel for the Debtors and Debtors in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

                    **LOS ANGELES DIVISION**
10 | In re: | Case No.: 2:10-bk-19762-RN |

11 | HOME ORGANIZERS, INC., a Delaware | Chapter 11 |

12 corporation, HOME CLOSETS, INC., a California
   corporation, CBD FRANCHISING, INC., a
   California corporation, CLOSETS BY DESIGN,
   (Jointly Administered with Case Nos.:
   2:10-19972-RN, 2:10-19973-RN, 2:10-19974-
13 INC., a California corporation, CLOSET WORLD,
   RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-
   19977-RN and 2:10-19978-RN)
14 INC., a Delaware corporation, CLOSET
   DIMENSIONS, INC., a California corporation, CBD
15 LAS VEGAS LLC, a Nevada limited liability
   company, and CLOSET WORLD ARIZONA, LLC, a
   **ORDER (1) DISMISSING CHAPTER 11
   CASES, AND (2) RESERVING
   JURISDICTION WITH RESPECT TO
16 Nevada limited liability company,
   SPECIFIED MATTERS**

17                              Debtors.

18 **Check One or More as Appropriate:**

   Affects All Debtors:                    ☒  Hearing:
19 Affects Home Organizers Inc. only:      ☐  Date:  July 22, 2010
   Affects Home Closets, Inc. only:        ☐  Time:  2:00 p.m.
20 Affects CBD Franchising, Inc. only:     ☐  Place:  Courtroom 1645
   Affects Closets By Design, Inc. only:   ☐           255 East Temple Street
21 Affects Closet World, Inc. only:        ☐           Los Angeles, CA 90012
   Affects Closet Dimensions, Inc. only:   ☐
22 Affects CBD Las Vegas LLC only:         ☐
   Affects Closet World Arizona LLC only:  ☐
23

24

25        The Motion For Dismissal Of Chapter 11 Cases (the "Motion"), filed by the above-captioned

26 debtors (the "Debtors"), came on for hearing before the Honorable Richard M. Neiter, United States

27 Bankruptcy Judge, on July 22, 2010, at 2:00 p.m. (the "Hearing").  Appearances were made as

28 reflected in the Bankruptcy Court's record.  Capitalized terms used herein shall have the meanings

   ascribed to them in the Motion, unless otherwise defined.

**Exhibit C
Page 42**

After consideration of the Motion and accompanying supporting papers, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT:**

A.      Subject to the terms, conditions and reservations of jurisdiction set forth in this Order, the Debtors' chapter 11 cases are hereby dismissed pursuant to sections 305(a)(1) and 1112(b) of the Bankruptcy Code.

B.      The dismissal shall not affect any orders, judgments, or findings of facts and conclusions of law entered by the Court during the pendency of the cases, all of which shall continue in force and effect notwithstanding the dismissal.

C.      The Court hereby retains jurisdiction to determine the fees and expenses that shall be paid to the Debtors' professionals pursuant to section 330 of the Bankruptcy Code for services provided to the Debtors during the Debtors' chapter 11 cases.  Within forty-five days after entry of this Order, all professionals seeking compensation shall file a final fee application with the Court and the Debtors' bankruptcy counsel shall serve on all creditors a notice of hearing on the applications; *provided, however*, immediately upon dismissal and prior to such hearing the Debtors are authorized to make payments to professionals in the Debtors' discretion, which payments shall be treated as interim payments in accordance with section 331 of the Bankruptcy Code.

D.      The United States Trustee is awarded a judgment for all United States Trustee Quarterly Fees due and owing through entry of this Order, which shall be paid no later than thirty days after entry this Order.

E.      The Bankruptcy Court shall retain jurisdiction to interpret and enforce the terms or effect of this Order.

F.      This Order shall be effective immediately upon entry.

###

**Exhibit C**
**Page 43**

| | |
|---|---|
| In re: HOME ORGANIZERS, INC., a Delaware corporation, HOME CLOSETS, INC., a California corporation, CBD FRANCHISING, INC., a California corporation, CLOSETS BY DESIGN, INC., a California corporation, CLOSET WORLD, INC., a Delaware corporation, CLOSET DIMENSIONS, INC., a California corporation, CBD LAS VEGAS LLC, a Nevada limited liability company, and CLOSET WORLD ARIZONA, LLC, a Nevada limited liability company,<br><br>                                           Debtor. | CHAPTER  11<br><br>CASE NUMBER  2:10-bk-19762-RN<br><br>(Jointly Administered with Case Nos.: 2:10-19972-RN, 2:10-19973-RN, 2:10-19974-RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-19977-RN and 2:10-19978-RN) |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, Suite 1450, Los Angeles, CA  90067.**

A true and correct copy of the foregoing document described as **Notice of Motion and Motion for Dismissal of Chapter 11 Cases; Memorandum of Points and Authorities; Declarations of Gerard A. Thompson and Alexander Stevenson**, will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 1, 2010,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Paul S Arrow     parrow@buchalter.com, ifs_filing@buchalter.com
- Korin A Avelino     kelliott@ktbslaw.com
- Russell Clementson     russell.clementson@usdoj.gov
- Scott F Gautier     sgautier@pwkllp.com
- Julian I Gurule     jgurule@milbank.com
- Jennifer Leland     jleland@pwkllp.com
- Krikor J Meshefejian     kjm@lnbrb.com
- Dennis D Miller     dmiller@steinlubin.com
- Monserrat Morales     mmorales@pwkllp.com
- David L. Neale     dln@lnbrb.com
- Andrew S Pauly     apauly@gpfm.com
- Christopher S Reeder     ecfnotices@reederlu.com
- Allan D Sarver     ADSarver@aol.com
- Benjamin Seigel     bseigel@buchalter.com, IFS_filing@buchalter.com
- David B Shemano     dshemano@pwkllp.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Alex P Vu     alex.vu@wellsfargo.com
- Kimberly S Winick     kwinick@clarktrev.com
- Beth Ann R Young     bry@lnbrb.com

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                              **F 9013-3.1**

| | |
|---|---|
| In re: HOME ORGANIZERS, INC., a Delaware corporation, HOME CLOSETS, INC., a California corporation, CBD FRANCHISING, INC., a California corporation, CLOSETS BY DESIGN, INC., a California corporation, CLOSET WORLD, INC., a Delaware corporation, CLOSET DIMENSIONS, INC., a California corporation, CBD LAS VEGAS LLC, a Nevada limited liability company, and CLOSET WORLD ARIZONA, LLC, a Nevada limited liability company,<br><br>Debtor. | CHAPTER 11<br><br>CASE NUMBER 2:10-bk-19762-RN<br><br>(Jointly Administered with Case Nos.: 2:10-19972-RN, 2:10-19973-RN, 2:10-19974-RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-19977-RN and 2:10-19978-RN) |

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On __July 1, 2010__, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge __will be__ completed no later than 24 hours after the document is filed.*

**Served by U.S. Mail:**
Honorable Richard M. Neiter
United States Bankruptcy Court – Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1652
Los Angeles, CA 90012

☐  Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on __July 1, 2010__, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge __will be__ completed no later than 24 hours after the document is filed*

**Served by Electronic Mail:**
**Debtor**
Tony Natale: tony@shepcorp.com

**Served by Electronic Mail:**
**Counsel for SKM**
Michael Tuchin, Esq.
mtuchin@ktbslaw.com
David Stern, Esq.
dstern@ktbslaw.com

**Served by Electronic Mail:**
**Counsel for Madison Capital Funding LLP**
Randall L. Klein, Esq.
randall.klein@goldbergkohn.com

**Served by Electronic Mail:**
**Counsel for Exclusive Funding LLC**
Marc Cohen, Esq.
marccohen@kayescholer.com
Ashleigh Danker, Esq.
adanker@kayescholer.com

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F 9013-3.1**

| | |
|---|---|
| In re:  HOME ORGANIZERS, INC., a Delaware corporation, HOME CLOSETS, INC., a California corporation, CBD FRANCHISING, INC., a California corporation, CLOSETS BY DESIGN, INC., a California corporation, CLOSET WORLD, INC., a Delaware corporation, CLOSET DIMENSIONS, INC., a California corporation, CBD LAS VEGAS LLC, a Nevada limited liability company, and CLOSET WORLD ARIZONA, LLC, a Nevada limited liability company,<br><br>Debtor. | CHAPTER  11<br><br>CASE NUMBER  2:10-bk-19762-RN<br><br>(Jointly Administered with Case Nos.: 2:10-19972-RN, 2:10-19973-RN, 2:10-19974-RN, 2:10-19975-RN, 2:10-19976-RN, 2:10-19977-RN and 2:10-19978-RN) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 1, 2010 | Matthew M. Dryer | /s/ Matthew M. Dryer |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                     **F 9013-3.1**